BROWN, Chief Judge.
| defendant, 21-year-old Raco (aka “Rico”) Allen, was charged by grand jury indictment with the second degree murder of 25 year old Jacoby Taylor. La. R.S. 14:30.1. A unanimous jury found Allen guilty as charged. Defendant was sentenced to serve the statutorily mandated life imprisonment at hard labor without the benefit of parole. Allen was also sentenced to serve ten days’ imprisonment in lieu of court costs concurrently with his life sentence.
Allen now appeals, alleging insufficiency of the evidence; trial court error in the denial of a motion in limine to redact certain portions of Allen’s recorded statement to the police; and excessiveness of his sentence. In addition, defendant untimely filed a pro se appellate brief in which he argues ineffective assistance of counsel.
Allen’s conviction and sentence are affirmed.

Discussion

Sufficiency of the Evidence

It is not disputed that on the night of August 17, 2013, in the Lakeside neighborhood of Shreveport, Louisiana, defendant, in a drive-by shooting, fired eight rounds into a crowd of people. One of those rounds struck and killed Jacoby Taylor. Defendant, who was in the back seat, contends that a shot from the crowd was fired at the vehicle in which he was riding, striking above the rear window. Therefore, defendant “claims that the state failed to negate the possibility that he committed the homicide in self-defense.”
The law for reviewing a sufficiency of the evidence claim is well-settled in Louisiana. As directed in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), an appellate court reviews the record in lathe light most favorable to the prosecution to determine whether the evidence was sufficient to convince any rational trier of fact that all the essential elements of the crime had been proven beyond a reasonable doubt. State v. Tate, 01-1658 (La.05/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004).
Jurors are supposedly impartial and unbiased and must determine the believability of the evidence and are charged to make a credibility determination. They may, within the bounds of rationality, accept or reject the testimony of any witness; the reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law. State v. Casey, 99-0023 (La.01/26/00), 775 So.2d 1022, cert. denied, 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000).
La. R.S. 14:30.1, second degree murder, states in relevant part:
A. Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm; or
(2) When the offender is engaged in the perpetration or attempted perpetration of ... assault by drive-by shooting ,.. even though he has no intent to kill or to inflict great bodily harm.
A “drive-by” shooting means the discharge of a firearm from a motor vehicle on a public street or highway with the intent either to kill, cause harm, or frighten another person. La. R.S. 14:37.1. *379 Such a specific intent may be inferred from a defendant’s act of pointing a gun and firing it at a person. State v. Brown, 42,054 (La.App.2d Cir.08/29/07), 965 So.2d 580, writ denied, 07-1939 (La.02/15/08), 976 So.2d 174, writ granted and transferred on other grounds sub nom. State ex rel. Brown v. State, 09-2683 (La.02/05/10), 27 So.3d 290.
Self-defense is justification for a killing only if the person committing the homicide reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that deadly force is necessary to save his life. La. R.S, 14:20(1); State v. Dooley, 38,763 (La.App.2d Cir.09/22/04), 882 So.2d 731, writ denied, 04-2645 (La.02/18/05), 896 So.2d 30.
When self-defense is raised as an issue by the defendant, the state has the burden of proving, beyond a reasonable doubt, that the homicide was not perpetrated in self-defense. State ex rel. D.P.B., 02-1742 (La.05/20/03), 846 So.2d 753; State v. Garner, 39,731 (La.App.2d Cir.09/08/05), 913 So.2d 874, writ denied, 05-2567 (La.05/26/06), 930 So.2d 19. When the defendant challenges the sufficiency of the evidence in such a case, the question becomes whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the homicide was not committed in self-defense. State v. Matthews, 464 So.2d 298 (La.1985).
Shreveport Police officers responded to a report of a domestic dispute at approximately 7:00 p.m. on August 17, 2013, in the Lakeside neighborhood. According to an incident report, officers made contact with Shunquail Allen, defendant’s sister, and the father of her children, Robert Clark. There allegedly had been a physical dispute between the two parties, but neither Shunquail nor Clark was arrested or otherwise taken into custody. The incident report categorized the incident as a “simple battery call.”
| ¿Later that evening a crowd gathered down the street. Included in this group were Darien Bradley, who was standing with a few young children in the front yard of a home on Poland Street; Jacoby Taylor and Jammie Bradley, who were talking to Deloris Fountain/Clark, who was sitting in the driver’s seat of her parked vehicle (which also had three children in the back seat); and Sherita Bradley, Robert Clark and Jerrick Stephenson (also spelled “Stevenson” in the record), who were standing behind the parked car in the roadway of Poland Street.[1]
Shenita Bradley, Jammie Bradley, and Darien Bradley, all eyewitnesses to the shooting, testified that they were standing with a number of other people on Poland Street near the corner of Alabama Avenue when they observed a Ford Crown Victoria slowly driving eastbound on Poland Street. Specifically, Jammie testified that she observed the Crown Victoria stop as Shunquail approached it. Jammie testified that she saw Shunquail point toward the crowd. The Crown Victoria then moved toward the group, Shenita, Jammie and Darien all testified that they saw the back passenger side door of the car open, with Allen leaning out of the door, aiming his weapon, and firing numerous shots into the crowd. None of these witnesses testified to hearing any gunshots or seeing any other weapon before Allen fired his gun. These witnesses identified the shooter as *380 defendant, Raco Allen. On August ■ 18, 2013, the SPD obtained a warrant for Allen’s arrest.
On the evening of August 20, 2013, Allen appeared at the Shreveport Police Department. Detectives verbally informed Allen of his Miranda |firights, and defendant signed a form acknowledging that he was informed of and understood his Miranda rights. Allen brought a .45 caliber Hi-point firearm with a magazine and some ammunition with him to the police station. Defendant proceeded to make a statement, which was subsequently recorded by the police officers. Allen told the detectives that he was in the back seat on the passenger side of Washington’s car as they drove down Poland Street. Defendant said that as they were on the way to drop off Bra-non Oliver, Allen’s sister, Shunquail ran up to the vehicle and tried to talk to him and Washington. Allen said that he told Washington to keep on driving.
Approximately one hour into the interview, defendant confessed to firing his weapon into the crowd of people. Allen said that as they were driving down Poland Street, he saw a group of people in the road “standing alert,” and he saw Jer-rick Stephenson (aka “Coco”) standing with the crowd in a way that suggested that Stephenson was carrying a weapon. Allen said that as the vehicle approached the crowd, he opened the back passenger door and fired seven or eight shots into the crowd and told Washington to drive away. Defendant said that when he opened the door, he did not see Stephenson in the crowd and did not see Stephenson "or anyone else aiming a weapon. Allen then said that after they left the scene, he jumped out of the car and used someone’s cell phone to call the mother of his child to pick him up. Allen maintained that he did not know that he shot anyone, and he did not mean to hurt or kill anyone. Defendant admitted to officers that the gun that he brought to the station was not the weapon he used in the shooting. He told police that he gave the weapon in question to someone named “Fish” and told him to get rid of.it.
| fiWhen asked why he did not come and speak with police sooner, Allen told Detectives Bonillas and Holden that he had been staying at his girlfriend’s house, he had not left the house (except for on one occasion to get a change of clothes), and he did not have access to cable, internet or a telephone. Defendant said that he only found out that there was a warrant out for his arrest because his girlfriend told him that her mother saw him on the news. According to Allen, it was not until that time that he found out that someone had died as a result of the shooting. It is this part of the interview that defendant objected to being heard by the jury. He also objected to the part wherein he referred to the fact that he could not buy a gun. Both parties agreed that Allen’s statement to police was freely and voluntarily made. Defendant’s statement in full was presented to the jury.
Officer Marcus Mitchell, an expert in crime scene investigation with the Shreveport Police Department, testified that he arrived on the scene shortly after the shooting. Officer Mitchell described his observations of the scene and used photographs that he took to illustrate his description. Officer Mitchell also discussed the evidence recovered, including nine spent bullet casings, which were subsequently logged and sent to the North Louisiana Crime Lab for further analysis.
Officer. Mitchell testified that he also analyzed the Ford Crown Victoria a few days after the shooting. Officer Mitchell took photographs of the vehicle and specifically noted damage to the drivers’ side rear window area. Officer Mitchell testi *381 fied that he could not verify whether-the damage was caused by a bullet, but he opined that the damage was not likely to have been caused by a bullet; if it had he would have expected some evidence of [ ycharring on the ragtop fabric or indentation in the metal under the fabric at the location of the damage.
Dr. Long Jin, a forensic pathologist, testified that he performed the autopsy on Jacoby Taylor. Dr. Jin testified that Taylor died as a result of a single penetrating gunshot wound to the back of the head. Dr. Jin recovered the bullet from Taylor’s brain and sent it to the North Louisiana Crime Lab for processing. Dr. Jin testified that he did not observe any smoke or stippling around the bullet’s entry point. According to Dr. Jin, this was indicative of the gun being fired from at least three feet away, not at close range. Dr. Jin testified that Taylor’s death was instantaneous. The defense did not cross-examine Dr. Jin.
Branon Oliver, who was a "witness for the prosecution, testified that he called Washington and asked him to pick him up at the McDonald’s on Greenwood Road because he was having car trouble. Oliver said that Washington and defendant picked him up in Washington’s Ford Crown Victoria. Washington was driving, Oliver sat in the front seat, and defendant sat in the back passenger seat. Oliver testified that while they were driving, “some girl” whom he did not know 'stopped the car and talked to Washington. Oliver said that defendant told Washington to leave because Shunquail and Clark always fought, and he did not want anything to do with it. Oliver denied seeing defendant fire any rounds. All Oliver knew is that someone shot at their car, and he dropped down to the floorboard. At this point, the prosecutor’s direct examination abruptly switched to an aggressive cross-examination. There was no objection from defense counsel, and it became clear that Allen’s attorney knew that Oliver was going to change his story from what he told the detectives on the night of the killing.
| sOliver reluctantly agreed that he went to the police station right after the shooting to make a statement. At that time, Oliver related to investigators that he knew that the woman who stopped the car was Allen’s sister Shunquail; he observed that Allen was “hyped” after talking with Shunquail; he saw , Allen open the back passenger door and shoot into the crowd; and, he thought someone in the crowd was shooting at the ear. Defense counsel had no questions for Oliver.
The state later called Detective Holden to testify and identify Oliver’s statement. A CD of Oliver’s recorded statement was admitted into evidence and played to the jury. There was no objection by the defense.
Detective Sherita Holden, who responded to the crime scene and took defendant’s statement, testified that the Lakeside area is known to be a “high crime” area and Shreveport Police recéive -reports of gunfire “fairly often.” Defense counsel objected to her statement, which was overruled but he did not cross-examine her.
David Hensley, an investigator with the Caddo Parish District Attorney’s Office, testified for the state. Hensley testified that he was tasked with finding and serving process upon certain witnesses to the shooting. According to Hensley,- he was unable to find and serve Troy Washington (the driver of the Crown Victoria), Shun-quail Allen (defendant’s sister) and Robert Clark (the father of Shunquail Allen’s children and an alleged eyewitness to the shooting). Finally, Hensley stated that he did not serve Deloris Fountain/Clark because she had died. Defense counsel did not cross-examine Hensley.
*382 Richard Beighley, a firearms identification expert with the North Louisiana Crime Lab, testified that he received nine shell casings recovered |8from the crime scene and one bullet retrieved from the victim’s body during the autopsy to analyze. Beighley testified that eight of the nine shell casings were 9 mm cartridges and fired from the same weapon, which was most likely a 9 mm Hi-Point firearm. Beighley also testified that, while he did not have a gun to compare to the bullet recovered from the victim, the bullet had markings consistent with' the known characteristics of a Hi-Point firearm. Beigh-ley explained that the “ninth shell casing” was also a 9 mm shell casing, but it had different characteristics and markings, which were inore consistent with a Ruger Pistol. •
Beighley also testified about the damage to the Ford Crown Victoria. While Beighley testified that he “could not do a definite conclusion as to what caused the damage,” he explained that it was highly improbable that the damage was caused by a bullet based on the angle and the type of resultant damage.
■ The defense called Jerriek Stephenson as its first witness. Stephenson testified that he was on Poland Street at the time of the shooting, but did not see who shot. Stephenson testified that he did not have a weapon; he did not fire any shots; he did not run from any police officers; he did not run from the scene to Anthony Wilson’s house; he did not remember seeing Wilson or Devonte Dillard on the night of the shooting; he did not remember what he was wearing, but he did not ask anyone for a change of clothes; and, he did not attempt to give or ask anyone to take a gun from his possession.
The next defense witnesses were called to discredit or impeach Jerriek Stephenson. Anthony Wilson testified that he was in his home in the Lakeside neighborhood on the day of the shooting. Even though Wilson did not witness the shooting, he heard the gunshots and walked outside to see 1 ipwhat was going on. Upon stepping outside, less than 10 minutes after hearing the shots, Wilson saw-Stephenson walking toward his house. According to Wilson, Stephenson was wearing “colorful, light colored” clothes. Wilson testified that Stephenson was carrying a gun and asked Wilson to hold the weapon for him.. Wilson testified that he refused to take the weapon. The state did not cross-examine Wilson.
Devonte Dillard testified next for the defense. Dillard testified that while he did not witness the shooting, he did hear shots fired when he was inside Wilson’s house. Dillard said that he walked out of the house upon hearing the shots and saw Stephenson running toward him. Dillard testified that Stephenson, who was wearing a Nike shirt, came into the house and asked for a change of clothes. Dillard gave Stephenson a muscle shirt. Dillard also said that he saw Stephenson holding a silver gun. The state did not cross-examine Dillard.
Officer Steven Dassell with the Shreveport Police Department testified that he was on Milam Street responding to a disturbance call when he was flagged down by concerned citizens who told him about the gunshots on Poland Street. Officer Dassell stated that while he was heading toward Poland Street, he encountered a black male wearing a yellow shirt and holding a chrome or silver handgun at his chest. Officer Dassell shined his flashlight on the black male, but the man ran away. Officer Dassell stated that he observed the black male running through an alley and heading north toward Anna and Abbie Stoeets.
*383 Finally, the defense recalled Detective Holden, who testified that she interviewed Anthony Wilson at the crime scene. At that time, Wilson said that he stepped out of his house when he heard gunshots. While standing |noutside, Wilson saw Stephenson running down an alley toward the house. According to Detective Holden, Wilson said that Stephenson seemed visibly upset, and he asked Wilson to take his gun from him, which Wilson described as a silver pistol, but Wilson declined. Wilson apparently described Stephenson as wearing a yellow shirt and- light shorts. Detective Holden also testified that she interviewed Devonte Dillard at the crime scene. According to Det. Holden, Dillard said he stepped outside with Wilson after they heard gunshots. Dillard told Holden that he saw Stephenson run through an alley, jump a fence, and run toward the house. Like Wilson, Dillard told Det. Holden that he saw Stephenson with a handgun and wearing a light green Nike shirt and cargo shorts. The state did not cross-examine Det. Holden.[2]
The parties do not dispute that Allen opened the car door and fired his weapon eight times into the crowd of people standing on Poland Street. Pursuant to, La. R.S. 14:30.1(A)(2), the state did not need to prove that Allen intended to kill or seriously injure anyone. See La. R.S. 14:30.1(A)(2); La. R.S. 14:37.1. However, based on the testimony, the jury could have reasonably concluded that defendant fired his weapon with the intent of killing or seriously harming Robert Clark. See State v. Brown, supra at 586 (“it is of no consequence whether defendant, in firing his weapon into a crowd, intended to hit one person or several people”); State v. Johnson, 29,629 (La.App.2d Cir.08/20/97), 698 So.2d 1051.
[ ^Furthermore, no one, including defendant, claimed to have seen Stephenson or anyone else in the crowd standing on Poland Street with a weapon, nor did anyone other than Branon Oliver assert that they heard any shots before defendant started firing. Oliver was completely discredited. It was not unreasonable for the jury to believe the testimony of Shenita Bradley, Jammie Bradley, and Damien Bradley. Based on the testimony, of Det. Holden regarding the reputation' of the Lakeside area and the expert testimonies of Beigh-ley and Officer Mitchell regarding the damage to the Ford Crown Victoria, it was not unreasonable for the jury to conclude that the ninth shell casing came from a previous, incident and that the damage to the car was not caused by a bullet.
The discrediting of the testimony of Jer-riek Stephenson goes to his credibility, not the truth of any alleged statement; however, the testimony of defense witnesses, Anthony Wilson, Devonte Dillard, and SPD Officer Dassell, was independently relevant as to whether anyone else had a gun at the time of the shooting but did not show that anyone actually used the weapon or shot at the vehicle in which defendant was a passenger, A reasonable jury could have found Allen guilty of second degree murder.

Motion in Limine

At issue is an excerpt from Allen’s recorded statement to police wherein defendant stated that he went to purchase a gun at a pawn shop but was riot allowed to purchase one there. The detectives did not inquire as to why Allen did not buy a gun at the pawn shop. Neither Allen nor *384 the detectives made reference to any particular crime or bad act previously committed by Allen. Defendant’s reference to not purchasing a gun at the | iapawn shop is the type of “vague' and ambiguous” statement that does not constitute “other crimes” evidence under La. C.E. art. 404(B).'
In any' case, even if Allen’s statement about not purchasing a gun at the pawn shop was erroneously admitted, its admission was almost certainly harmless error. The jury’s guilty verdict was surely not attributable to a suggestion that Allen may have had a prior criminal record.
Next, there was no error in failing to redact Det. Bonillas’s statements and questions to Allen regarding why Allen did not come forward or “turn himself in” sooner. Allen voluntarily went to the police station and, as agreed by his attorney, his statement was free and voluntary. As such, those statements did not .violate Allen’s right to remain silent and to not incriminate himself. State v. Smith) 11-0664 (La.App. 4th Cir.01/30/13), 108 So.3d 376, writ denied, 13-0472 (La.10/04/13), 122 So.3d 551.

Sentencing

Allen argues that his sentence was not particularized. He also claims that' the trial court did not consider constitutional excessiveness, order a pre-sentence investigation report, or otherwise consider his social history or “what [Allen] was like as a person.” Allen contends that the trial court failed to explain his reasoning for imposing a life sentence and should have used the factors set forth in La. C. Cr. P. art. 894.1 to give reasons and provide a more particularized sentence.
Where there is a mandatory sentence, there is no need for the trial court to justify under article 894.1 a sentence it is legally required to impose. State v. Robinson, 47,347 (La.App.2d Cir.11/14/12), 106 So.3d 1028, writ denied, 12-2658 (La.05/17/13), 117 So.3d 918.
|14In State v. Dorthey, 623 So.2d 1276 (La.1993), and State v. Johnson, 97-1906 (La.03/04/98), 709 So.2d 672, the Louisiana Supreme Court addressed the issue of mandatory sentences in the context of the habitual offender law. The court held that the downward departure from a mandatory minimum sentence may occur in rare circumstances if the defendant rebuts the presumption of constitutionality by showing clear and convincing evidence that he is exceptional, namely, that he is a victim of the legislature’s failure to assign sentences that are meaningfully tailored to the gravity of the offense, the culpability of the offender, and the circumstances of the case.
In this case, Allen has not demonstrated any mitigating circumstances that would warrant a downward departure from the mandatory sentence.

Pro Se Assignment

Allen’s claims of ineffective assistance of counsel are more properly raised in an application for post-conviction relief (“PCR”) with the trial court than on appeal. Allen’s specific ineffective assistance claims cannot be resolved based on the record before this Court. As such, the remedies available under the PCR standards are more appropriate. State v. Ellis, 42,520 (La.App.2d Cir.09/26/07), 966 So.2d 139, writ denied, 07-2190 (La.04/04/08), 978 So.2d 325; La. C. Cr. P. arts. 928, 929, 930.

Conclusion

Based on the foregoing, defendant’s conviction and sentence are affirmed.

. The approximate orientation of the people standing on and around the corner of Alabama Avenue and Poland Street is based on the testimony of" Shenita Bradley, Jammie Bradley, and Darien Bradley.

. The usual sequence is that a witness's direct testimony is presented and rehabilitation is not allowed until that witness’s credibility is questioned on cross-examination. Then, on redirect the rehabilitation (you told the police this same story) is offered. There was no cross or any effort to discredit these witnesses.