MOORE, J.
The defendant, Kevin Bowers, was charged with one count of second degree murder for fatally shooting Dajuan Kennedy, a violation of La. R.S. 14:30.1. After trial, the jury returned a guilty verdict of manslaughter, La. R.S. 14:31. Subsequently, Bowers was adjudicated a fourth-felony offender, and the court sentenced him to life imprisonment at hard labor, without the benefit of probation, parole, or suspension of sentence. Bowers' motion to reconsider sentence was denied. This appeal followed in which Bowers challenges the sufficiency of the evidence for the verdict of manslaughter. For the follow reasons, we affirm the conviction and sentence.
FACTS
During the early morning hours of August 28, 2014, Shreveport police officers were dispatched to the residence located at 4136 Jacob Street in response to a shooting reported by a 911 call. At the residence, they found DaJuan Kennedy lying face down in the driveway. Paramedics had already determined that Kennedy was dead. Including the victim and the defendant, there were five men present during the moments before and during the shooting who testified as witnesses to all or part of the incident.
Jeremy Shepard, Kennedy's uncle, testified that he and his brother, Roderic Kennedy ("Roderic"), were living in their grandparents' house at 4136 Jacob Street the night that the shooting occurred. Shepard testified that he and Roderic were sitting on a little brick patio in the front of the house. Their nephew, DaJuan Kennedy, arrived around 10:30 p.m. The three men sat in the front yard, talking and drinking beer, and were later joined by Rajohn Chapman.
Shepard testified that around midnight, Bowers drove by the house in a "burgundy Ford," and Chapman flagged him down. Bowers remained in his vehicle while Chapman went out to the vehicle to talk with him. As Roderic approached the vehicle, Bowers accused Shepard of sending Roderic out. Shepard denied sending Roderic, but Bowers began calling Shepard and Kennedy "bitch-ass niggas." Kennedy was offended and challenged Bowers to a fight. Kennedy took off his white T-shirt, stepped onto the home's driveway and *588 asked Bowers again whether he wanted to fight. Shepard testified that Bowers got out of his vehicle and walked toward Kennedy, but Shepard stepped between the two men and broke up the fight. Shepard pulled Kennedy into the front yard and forced him to sit down. Bowers returned to his vehicle and drove off, leaving Shepard, Roderic, and Kennedy in the front yard. Shepard said that he did not observe a gun or any weapon on Kennedy when he removed his shirt. When Kennedy sat down, he put on his shirt, he, Roderic and Dajuan resumed drinking, thinking that the trouble was over. Shepard said that Rajohn was no longer with them, but they were soon joined by another man, Elijah Patton, aka "Poobie."
According to Shepard, five minutes later, Bowers returned to 4136 Jacob Street. He stopped at the front gate of the house. DaJuan and the defendant began having words again and DaJuan was ready to fight. Shepard testified that the defendant said, "y'all bitch-ass niggas really don't want to do this." He got out of the vehicle and walked toward the rear of the vehicle. Shepard stated that he was trying to grab his nephew's (DaJuan) arm and they took off running toward the back of the house. As Shepard and Kennedy ran toward the home, Shepard heard two gunshots. Shepard testified that Kennedy dropped, face first, to the ground after the second shot. Shepard saw Bowers return to his vehicle and drive away. DaJuan told him that he was hit and to call 911. Shepard called 911 and held Kennedy until the ambulance arrived. Shepard denied seeing Kennedy with a gun or removing a weapon from Kennedy's person. Shepard also noted that he was unaware of any prior altercations between Bowers and Kennedy.
Elijah Patton joined the men just before the shooting occurred. He testified that he is a friend of the Kennedy family and was present when Kennedy was shot. Patton testified that he arrived at the house around 2:00 a.m. He said that as he pulled up to the home in his vehicle, Bowers drove away from the home. As Patton got out of his vehicle, he observed Roderic, Shepard, and Kennedy sitting at a plastic table in the front yard. Patton said that no one else was present.
According to Patton, Kennedy appeared upset. The three men informed Patton of the argument between Kennedy and Bowers. About five minutes after Patton arrived, Bowers returned and jumped out of his vehicle. Bowers began calling the four men "niggas" and walked up to the fence that surrounds the home's front yard. Bowers turned back to his vehicle and retrieved something from the vehicle's trunk. Patton stated that he immediately ran toward the side of the home with Roderic, and as he ran, Patton heard two gunshots. Patton recalled that Kennedy and Shepard were walking toward Bowers when Patton ran away. When Patton returned to the front yard, he observed Kennedy face down on the ground of the driveway. Like Shepard, Patton testified that Kennedy did not have any weapons on him. Patton also testified that he did not hear anyone tell Kennedy to shoot Bowers, nor did he see Bowers with a weapon.
Like Shepard and Patton, Roderic testified that he had been sitting in the front yard of 4136 Jacob Street for several hours the night of the shooting. Roderic was sitting with Kennedy and Shepard when they were joined by Chapman. Roderic stated that Chapman spoke with them for a few minutes before leaving, and Roderic went into the house to get some beer. When he returned to the front yard, Bowers had arrived and appeared to be arguing with Kennedy. Moments later, Bowers drove off just as Patton arrived. Roderic, Kennedy, Shepard, and Patton *589 sat down and continued drinking in the front yard. A few minutes later, Bowers returned. According to Roderic, Bowers got out of his vehicle, mumbled to himself, opened his vehicle's trunk, and pulled out a rifle. Upon seeing the rifle, Roderic told everyone to run. Roderic testified that he ran to the backyard, and as he ran, he heard a gunshot, followed by a second gunshot about four or five seconds later. Roderic heard a scream and ran back to the front yard and saw Kennedy face down on the ground. Kennedy tried to lift his head, but Roderic instructed him not to move. Roderic then called 911, and Kennedy died while waiting for the ambulance. Roderic noted that Bowers fled the scene as Roderic returned to the front yard.
Roderic denied that he had an argument with Bowers or asked him to return the scale he borrowed from Shepard. Roderic also testified that Kennedy was unarmed, and he did not tell Kennedy to shoot Bowers.
Dr. Long Jin, the forensic pathologist who performed Kennedy's autopsy, testified at trial describing the path of the bullet and the cause of death. Dr. Jin stated Kennedy was shot in his left back. The bullet moved slightly upward, through Kennedy's spinal cord, right lung, diaphragm, and liver, and exited his right chest. Kennedy bled to death as a result of being shot. Dr. Jin found that the nature of the wound was consistent with someone running. Dr. Jin also testified that he believed Kennedy was originally lying face up on the ground because of abrasions on his body that are consistent with turning him over. Dr. Jin noted that there was no soot in the wound ; therefore, Kennedy was not shot at close range.
Several other non-eyewitnesses, police officers and detectives testified at the trial regarding what they learned, knew or witnessed near or after the shooting. Sergeant Carter, one of the several Shreveport Police Department officers who were dispatched to the scene, testified that he and Corporal John Madjerick located two shell casings in the front yard about 6 to 8 feet apart. The shell casings appeared to be 5.56 casings typically used in AR-15 type assault rifles. Apparently a third shell casing of the same caliber was found nearby. Cpl. Madjerick testified that he located a total of three spent cartridges and one live round at the scene.[1] One unfired cartridge was located near Kennedy's body in the driveway. Cpl. Madjerick testified that the live round, a 10-mm cartridge, was discovered under Kennedy's body as it was being removed from the scene. He stated that the bullet was typically used in a handgun. A gunshot residue test was not conducted on Kennedy's hands because, he said, the results are generally inaccurate. He was unable to determine from where the live round came, and no firearms were recovered. A pair of dice was also recovered but not submitted for fingerprint or DNA analysis.
Katoria Eason, Bowers' aunt, who resides at 4140 Jacob Street, was home when the victim was shot. Eason testified that her nephew, Jemarcus, woke her up in the early hours of August 28, 2014, and the two of them went outside and stood in her front yard. From her location, she observed Kennedy's body on the ground in the front yard. While standing outside, she received a cell phone call from the defendant asking her to check on Kennedy. Eason refused because Kennedy already appeared dead. Eason left her front yard, *590 stood next to a police car, and remained there until she was brought to the police station for additional questioning. Eason said that she attempted to call Bowers again at the police's request; however, when Bowers answered his phone, a police officer took Eason's phone and began speaking to Bowers. Bowers hung up the phone and did not answer subsequent calls. Eason added that Bowers visited her home every day, but she did not see him the night of the shooting.
Police learned that Bowers was hiding within the Quail Creek apartment complex. Upon discovering Bowers in apartment 1000-B, Bowers was restrained by Cpl. McCloskey's K-9 partner, who bit Bowers in the arm. Cpl. McCloskey testified that Bowers was discovered in the rear bedroom attempting to hide in a corner of the room under bed linens.
Corporal Taywania Jackson, who accompanied Cpls. Jones and McCloskey to arrest Bowers, testified that she advised Bowers of his Miranda rights. Bowers told her that on August 28, 2014, he argued with Kennedy's uncle, who instructed Kennedy to shoot Bowers. Bowers claimed he pled with Kennedy to not shoot him and that he shot Kennedy in self-defense. Cpl. Jackson testified that several officers and marshals instructed Bowers not to speak, but Bowers continued to "babble and go on and on."
Shreveport Police Cpl. Jeff Couch testified that on October 8, 2014, he and another officer transported Bowers to the hospital after he was arrested. During transport, Bowers made additional statements recorded on Cpl. Couch's in-vehicle recording device and were delivered to the district attorney's office. During Cpl. Couch's testimony, the recording of Bowers' in-vehicle statements were played for the jury. In the recording, Bowers admitted to shooting Kennedy; however, he was adamant that he was acting in self-defense.
Finally, Detective Dailey testified that he was assigned to this case on August 8, 2014. He spoke with several witnesses. He testified that he showed Patton a six-person photographic lineup, and Patton identified Bowers as the shooter.
The defense called three witnesses: Rajohn Chapman, Katoria Eason, and the defendant. Chapman testified that he arrived at 4136 Jacob Street around 4:30 p.m., prior to the shooting. Chapman stated that Kennedy, Shepard, and Roderic were drinking, but denied seeing drug activity. According to Chapman, Bowers arrived in his vehicle at the home around 11:00 p.m. and invited Chapman to a club to see a rap group perform. Chapman testified that Bowers remained in his vehicle as they spoke, and while they were speaking, Roderic approached Bowers' vehicle and asked Bowers about a scale Shepard had loaned him.
An argument broke out between Bowers, Roderic, and Kennedy. Bowers exited his vehicle and confronted Kennedy in the home's front yard. Kennedy left the front yard, went into the home, and returned with a black handgun. Chapman stated that Bowers, upon seeing the gun, returned to his vehicle and drove away, ducking down as he drove. Chapman then witnessed Kennedy walk to the end of the driveway and point the gun at Bowers' retreating vehicle. Patton arrived as Bowers drove away, and Bowers returned a few minutes later. Chapman testified that Bowers exited his vehicle without a gun and asked Kennedy to put his gun down. Kennedy placed the gun in the back of his pants and removed his shirt, as if preparing to fight. Chapman stated the two men stared at each other for a moment, and Kennedy put his shirt back on and pulled out the gun. Chapman claimed that he *591 heard Roderic tell Kennedy to "bust [Bowers]." Bowers moved to the passenger side of his vehicle and Kennedy pointed the gun at Bowers. Bowers then pulled a gun from his vehicle, and Chapman heard gunshots.
Chapman stated that he was sitting on the home's front porch when two or three shots were fired. After the shots were fired, Chapman claimed that he left the porch and went over to Kennedy, who was lying face down in the front yard. Chapman testified that he turned Kennedy over and, after seeing that Kennedy was bleeding, instructed Shepard to call 911. Chapman testified that he did not see Kennedy's gun, nor did he see anyone remove the gun from Kennedy's body. Chapman then went to 4140 Jacob Street and informed Eason and her family of the shooting. Chapman told Eason what he observed but left the scene without speaking to the police officers as he had several outstanding warrants.
On cross-examination, Chapman testified that he saw Bowers shoot Kennedy and that the impact from being hit propelled Kennedy backwards, but Kennedy fell face down. Chapman also stated that at some point, he turned Kennedy over to see whether he was hit.
Katoria Eason returned to the stand. She testified that she spoke to Chapman after the shooting, and Chapman told her that Kennedy pulled a gun on Bowers and tried to shoot Bowers. Chapman also told her that Kennedy's gun jammed, so Bowers shot him. Eason stated that she relayed this information to the police.
Kevin Bowers testified on his own behalf. He said that he has known the Kennedy family his entire life, and there was no bad blood between the families. Bowers stated that on August 8, 2014, he was temporarily living at 4140 Jacob Street. That night, while returning to 4140 Jacob Street to retrieve some clothes, he stopped at 4136 Jacob Street around 11:00 p.m. Bowers testified that he stopped his vehicle in front of the home at 4136 Jacob Street and observed Shepard, Chapman, Roderic, and Kennedy sitting in the front yard. Bowers, still in his vehicle, spoke to the men and invited them to a club. While Bowers spoke, Roderic approached Bowers' vehicle and asked Bowers to return a scale he borrowed from Shepard. Bowers told Roderic that he did not have the scale, which Bowers said was fine with Shepard but made Roderic angry. Roderic began to argue with Bowers when Kennedy approached Bowers' vehicle and threatened to fight him. In response, Bowers got out of his vehicle, walked to the front of his vehicle, and stood in front of Kennedy, who backed away.
Bowers said he turned to get back into his vehicle when Kennedy walked out to the driveway and pointed a gun at him. Bowers then got into his vehicle and drove away. In his rearview mirror, Bowers saw that Kennedy was still pointing the gun at Bowers' retreating vehicle, and Bowers ducked down and "hit the gas." Bowers testified that he drove for a few minutes but decided to return to 4140 Jacob Street and collect his clothes. Bowers stated that he passed 4136 Jacob Street and stopped in front of 4140 Jacob Street. As he got out of his vehicle, Bowers heard Roderic calling him names. Bowers walked to the passenger side of his vehicle and confronted Roderic. Kennedy ran into the street and yelled at Bowers, who admitted that Kennedy was not holding a gun at that point. Bowers heard Roderic tell Kennedy to shoot him, and Kennedy reached to the back of his pants and removed a black handgun. Kennedy pointed the gun at Bowers, who ducked behind his passenger door and retrieved his gun, a rifle, from the passenger side of his vehicle. Bowers testified that he did not want to *592 "stand here and wait to see if [Kennedy's] going to shoot me" and fired his weapon at the ground. When the gun went off, Bowers stated that everyone in the front yard ran in different directions.
After the first shot, Bowers returned to the driver's side of his vehicle and observed Kennedy standing in the home's front yard, still holding the gun. Bowers claimed that Kennedy appeared to shoot and run at the same time, so Bowers ducked and fired his weapon a second time. Bowers testified that Kennedy was still holding the handgun when he fell to the ground. Bowers said he left the scene and he discarded the rifle by throwing it out of his vehicle window.
Bowers was indicted by grand jury for the second degree murder of Dajuan Kennedy. Bowers entered a plea of not guilty at his arraignment.
After trial and deliberation, the jury found Bowers guilty of the responsive verdict of manslaughter. The trial court ordered a presentence investigation report. Bowers filed motions for new trial and post-verdict judgment of acquittal, which were denied by the trial court. Bowers was adjudicated a fourth-felony habitual offender, and on August 31, 2016, was sentenced to life imprisonment at hard labor, without the benefit of probation, parole, or suspension of sentence.
Bowers filed a motion to reconsider sentence, which was denied. This appeal followed.
DISCUSSION
In his sole assignment of error, Bowers contends that the state failed to present sufficient evidence to support the verdict. He maintains that he shot Kennedy in self-defense, and therefore, did not have the specific intent required for a conviction of manslaughter. Bowers asserts that the evidence clearly suggests that the shooting occurred due to the provocation of Kennedy, and a thorough review of the record reveals suspicious testimony on the part of the state's witnesses that is sufficient to create a reasonable doubt as to his guilt.
The state argues that despite certain discrepancies between the witnesses' testimony, there is ample evidence to support the verdict of manslaughter.
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the case in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia , 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) ; State v. Tate , 01-1658 (La. 5/20/03), 851 So.2d 921, cert. denied , 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004) ; State v. Christopher , 50,943 (La. App. 2 Cir. 11/16/16), 209 So.3d 255 ; State v. Carter , 42,894 (La. App. 2 Cir. 1/9/08), 974 So.2d 181, writ denied , 08-0499 (La. 11/14/08), 996 So.2d 1086. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford , 05-0477 (La. 2/22/06), 922 So.2d 517 ; State v. Dotie , 43,819 (La. App. 2 Cir. 1/14/09), 1 So.3d 833, writ denied , 09-0310 (La. 11/6/09), 21 So.3d 297.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of the evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in a light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by that evidence and inferred from the circumstances established *593 by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. State v. Sutton , 436 So.2d 471 (La. 1983) ; State v. Christopher , supra ; State v. Speed , 43,786 (La. App. 2 Cir. 1/14/09), 2 So.3d 582, writ denied , 09-0372 (La. 11/6/09), 21 So.3d 299.
Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Broome , 49,004 (La. App. 2 Cir. 4/9/14), 136 So.3d 979, writ denied , 14-0990 (La. 1/16/15), 157 So.3d 1127. If a case rests essentially upon circumstantial evidence, that evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438 ; State v. Gipson , 45,121 (La. App. 2 Cir. 4/14/10), 34 So.3d 1090, writ denied , 10-1019 (La. 11/24/10), 50 So.3d 827 ; State v. Broome , supra .
The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith , 94-3116 (La. 10/16/95), 661 So.2d 442. A reviewing court affords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Hill , 42,025 (La. App. 2 Cir. 5/9/07), 956 So.2d 758, writ denied , 07-1209 (La. 12/14/07), 970 So.2d 529. Likewise, a reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law. State v. Casey , 99-0023 (La. 1/26/00), 775 So.2d 1022, cert. denied , 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000) ; State v. Thomas , 50,898 (La. App. 2 Cir. 11/16/16), 209 So.3d 234.
Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1).
The defendant was convicted by the jury of manslaughter. Defined by La. R.S. 14:31.
A. Manslaughter is:
(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood has actually cooled, or that an average person's blood would have cooled, at the time the offense was committed.
Regarding the defendant's claim that the homicide was justified by self-defense, La. R.S. 14:20 provides in pertinent part:
A. A homicide is justifiable:
(1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.
(2) When committed for the purpose of preventing a violent or forcible felony involving danger to life or of great bodily harm by one who reasonably believes that such an offense is about to be committed and that such action is necessary for its prevention. The circumstances must be sufficient to excite the fear of a reasonable person that there would be serious danger to his own life or person if he attempted to prevent the felony without the killing.
When self-defense is raised as an issue by a defendant, the state has the burden of proving beyond a reasonable doubt, that *594 the homicide was not perpetrated in self-defense. State v. Allen , 50,703 (La. App. 2 Cir. 8/10/16), 200 So.3d 376 ; State v. Lensey , 50,242 (La. App. 2 Cir. 11/18/15), 182 So.3d 1059, writ denied , 15-2344 (La. 3/14/16), 189 So.3d 1066 ; State v. Johnson , 41,428 (La. App. 2 Cir. 9/27/06), 940 So.2d 711, writ denied , 06-2615 (La. 5/18/07), 957 So.2d 150. When the defendant challenges the sufficiency of the evidence in such a case, the question becomes whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the homicide was not committed in self-defense. State v. Allen , supra ; State v. Lensey , supra . Factors to consider in determining whether a defendant had a reasonable belief that the killing was necessary include the excitement and confusion of the situation, the possibility of using force or violence short of killing, and the defendant's knowledge of the assailant's bad character. State v. Allen , supra ; State v. Lensey , supra ; State v. Johnson , supra .
Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Speed , supra ; State v. Allen , 36,180 (La. App. 2 Cir. 9/18/02), 828 So.2d 622, writs denied , 02-2595 (La. 3/28/03), 840 So.2d 566, 02-2997 (La. 6/27/03), 847 So.2d 1255, cert. denied , 540 U.S. 1185, 124 S.Ct. 1404, 158 L.Ed.2d 90 (2004). It is the province of the jury to resolve conflicting inferences from the evidence. State v. Lattin , 51,372 (La. App. 2 Cir. 5/2/17), 219 So.3d 511 ; State v. Mickens , 31,737 (La. App. 2 Cir. 3/31/99), 731 So.2d 463, writ denied , 99-1078 (La. 9/24/99), 747 So.2d 1118. In the absence of internal contradiction or irreconcilable conflict with physical evidence, the testimony of one witness-if believed by the trier of fact-is sufficient to support for a requisite factual conclusion. State v. Lattin , supra ; State v. Jones , 34,863 (La. App. 2 Cir. 8/22/01), 794 So.2d 107, writ denied , 01-2648 (La. 8/30/02), 823 So.2d 938. Such testimony alone is sufficient even where the state does not introduce medical, scientific, or physical evidence. State v. Mickens , supra .
After review, we conclude that the evidence is sufficient to support Bowers' conviction.
There is no question that Bowers shot and killed Kennedy. Bowers admitted to the shooting and this fact was corroborated by all witnesses present at the shooting. Therefore, this case hinges on whether the jury believed Bowers was acting in self-defense. There is significant disagreement between the witnesses as to whether Kennedy had a gun, and whether he was attempting to shoot Bowers when Bowers shot Kennedy.
The evidence at trial indicated that he police recovered three spent shell casings from Bowers' gun and no spent shell casings from Kennedy's alleged handgun. A live round was found under Kennedy's body when he was moved. While this is consistent with Bowers' testimony that Kennedy's gun jammed as he attempted to shoot Bowers, no gun was found on or near Kennedy, and the witnesses denied removing any gun from Kennedy's clothes.
Dr. Jin testified that Kennedy's wound was consistent with him running, and the physical evidence suggested that Kennedy was shot in the back while retreating from Bowers. Even if Kennedy was armed, by running away, he was disengaging from the conflict, and Bowers was no longer acting in reasonable self-defense. Additionally, Bowers demonstrated that lethal force was not immediately necessary when he shot into the ground and the men, *595 including Kennedy, then fled the front yard.
As noted above, when a defendant charged with a homicide claims self-defense, the state has the burden of proving, beyond a reasonable doubt, that the homicide was not perpetrated in self-defense. By convicting Bowers of the responsive charge of manslaughter, it appears the jury gave some credence to Bowers' testimony but still found his actions did not constitute self-defense. There is a factual basis in the record to support the conviction. The jury's decision was reasonably based on a credibility call and, as such, it should not be disturbed on appeal.
CONCLUSION
For the foregoing reasons, we affirm the defendant's conviction and sentence.
CONVICTION AND SENTENCE AFFIRMED.

According to Cpl. Alexander, he discovered a shell casing in the ditch across the street from the crime scene. Cpl. Alexander notified the detectives assigned to the case and remained with the shell casing until it was collected as evidence.