Judgment rendered December 17, 2025.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 56,683-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                          Appellee

versus

ANTONIO LACEDRIC JOHNSON                     Appellant

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 376,991

Honorable Christopher T. Victory, Judge

* * * * *

LAW OFFICES OF J. RANSDELL KEENE          Counsel for Appellant
By: J. Ransdell Keene

JAMES E. STEWART, SR.                      Counsel for Appellee
District Attorney

WILLIAM J. EDWARDS
CHRISTOPHER BOWMAN
MARGARET RICHIE GASKINS
Assistant District Attorneys

* * * * *

Before COX, STEPHENS, and MARCOTTE, JJ.

**COX, J.**

This appeal arises out of the First Judicial District Court, Caddo Parish, Louisiana. Antonio Lacedric Johnson was found guilty by a unanimous jury of manslaughter and sentenced to 70 years' imprisonment at hard labor. Johnson appeals his conviction, arguing he acted in self-defense. For the following reasons, we affirm Johnson's conviction and sentence.

## FACTS

Johnson was arrested on July 9, 2020, for the second degree murder of Travarrius Adams, which occurred on May 27, 2020. He surrendered himself at Caddo Correctional Center. The following testimonies were presented at trial:

Shreveport Police Sergeant Colin Neville testified that he responded to the Oak Meadows Apartments in Shreveport at 2:25 p.m. on May 27, 2020. He stated that there was a silver Nissan on the left, a blue Chrysler on the right, and a black male in the passenger seat of the Chrysler who had been shot several times. Sgt. Neville testified that he checked on the victim, who still had a pulse, and called the fire department to assist the victim. He described the victim as "slumped across the passenger seat, like he was trying to exit out the door."

Shreveport Police Corporal Matthew Dixon testified that on the day of the shooting, he was working in the crime scene investigation unit. He stated that when he arrived on the scene, the two vehicles were approximately five to six feet apart. Cpl. Dixon testified that he marked evidence and took pictures of the crime scene, including a possible escape path through the woods. He stated that he did not find any evidence of bullets hitting the Nissan but identified 16 projectile indentions on the

Chrysler. Cpl. Dixon stated that he did not identify any defects on the Chrysler that appeared to be caused by a bullet being shot from the inside of the Chrysler. He identified multiple shell casings and bullets located around the Chrysler. Cpl. Dixon stated that he impounded and searched the vehicles; he found Johnson's identification card and debit card in the Nissan. He identified photos from the crime scene and the vehicles at the impound lot, which were all admitted into evidence.

Cpl. Dixon identified and described a diagram of the scene, including where all the evidence was located. A total of 133 exhibits were admitted during Cpl. Dixon's testimony. Cpl. Dixon testified that he did not recover any firearms from the scene or vehicles.

Wanda Tucker, Adams's mother, testified that Adams had five children, ranging from nine to six years old. She identified a picture of Adams taken in 2020.

Jaderrick Pouncey testified that on the day Adams was shot, he was at Geneva Lewis's apartment. He stated that Lewis is his cousin, and while visiting her, he called Johnson to come over so he could buy marijuana. Pouncey testified that Johnson arrived in a grey vehicle, driven by his girlfriend, "Toni"; Pouncey went downstairs and got in the vehicle with Johnson. Pouncey stated that before he could buy the marijuana, a guy pulled up, there was an altercation, and "it was quick." Pouncey did not recall any words spoken before the shots were fired. He stated that after the shooting, he went back into his cousin's apartment to let her know what was going on, and when he came back out, Johnson was gone. Pouncey testified that Johnson shot "Ma Pooh," and there were kids in the vehicle with "Ma Pooh."

On cross-examination, Pouncey clarified that "Toni" is Latoni Gardner, "Ma Pooh" is Adams, Gardner previously dated Adams, and they had one child together. Pouncey stated that he did not come out of his cousin's apartment to talk to police during the investigation because he "really wasn't trying to be involved with nothing that was going on." At the time of his testimony, Pouncey was incarcerated in East Baton Rouge Parish on a felon in possession of a firearm charge. Pouncey testified that he had a Glock 23 with him at the time of the shooting.

Dr. Long Jin, an associate professor at LSU Health Center in Shreveport, was accepted as an expert in forensic pathology. Dr. Jin performed the autopsy on Adams, and his report was admitted into evidence. He testified that Adams's cause of death was multiple gunshot wounds, some of which lacerated Adams's liver and went through his heart. Dr. Jin stated that Adams sustained 12 gunshot wounds.

Summer Johnson, an expert in forensic firearms examination, explained to the jury how a bullet functions when shot and how they are compared to one another. She testified that 9 mm casings were found at the scene, and although it is possible they could be shot from a Glock 23, which is a .40 caliber firearm, the casings had no indication of being fired from a .40 caliber firearm. Ms. Johnson stated that all 13 casings recovered from the scene were fired from the same weapon.

Andrea Small testified that she was in a relationship with Adams when he was shot. She stated that on the day of the shooting, Adams was driving her Chrysler, she was in the passenger seat, and her two children were in the backseat. She testified that they pulled up next to the Nissan, and when Adams rolled the window down, Johnson jumped out of the

Nissan and started shooting into her car. She stated that she got out and got her kids out of the backseat. Small testified that Adams did not have a gun that day and did not threaten Johnson before Johnson started shooting. Small identified the photo lineup she was shown at the police station and the picture she circled of the person who shot at her vehicle. On cross-examination, Small stated that they were going to the apartment complex because someone was calling Johnson, but she did not know who was calling or why.

Shreveport Police Detective Monique Coleman testified that she was the lead detective in the case. She stated that she ordered a six-person photo lineup from the Louisiana State Police and had another detective show it to Small. Det. Coleman stated that Small identified Johnson as the shooter. She testified that about a month after the shooting, she interviewed Pouncey, who also identified Johnson as the shooter.

Gardner testified on behalf of Johnson. She stated that Adams was her ex-boyfriend, and she was pregnant with his child at the time of the shooting. She testified that when they got to the apartment complex, Pouncey got in the backseat of the car, and about 30 seconds later, the Chrysler pulled up "really scary and fast." She stated that the Chrysler was still rocking after it stopped, and she and Johnson were both scared. Gardner testified that she saw Adams driving the Chrysler, and when he parked, he was moving quickly and about to get out of the car. She stated that Johnson had to wiggle to get out of the Nissan because the Chrysler was parked so close. She testified that after the shooting, Pouncey ran away, came back, got things out of the Chrysler, and was picked up by a white car before police arrived.

4

On cross-examination, Gardner stated that in her grand jury testimony, she did not say that the Chrysler pulled up in an aggressive manner. She stated that she was not asked about the manner in which the blue car pulled up. Gardner's testimony that Pouncey went through the Chrysler was inconsistent with her grand jury testimony that Pouncey went through the Nissan and asked her for Johnson's cell phone.

Johnson testified that he went to the apartment complex because Pouncey called him to buy some marijuana and pay him back $100 that he owed. He stated that Pouncey told him to pull in and park next to a blue car, but there was no blue car in the lot, so he directed Ms. Gardner to park in an empty space. Johnson stated that Pouncey had a gun on his hip when he got in the car with them, and he had never seen Pouncey carry a gun. He testified that then, the Chrysler pulled up, and Adams said, "I got y'all now."

Johnson testified that he and Gardner were staying with different friends, family members, and in hotels because of Adams. He stated that on the day of the shooting, with the way Adams pulled in and his history with Adams, he feared for his life. He stated that he grabbed his gun, opened the door, fell out of the door, and started firing at Adams. He testified that he ran from the apartment complex, jumped a fence, and ran to his mom's house; his mom took him to his sister's house. Johnson stated that because he thought he was going to jail, he spent time with his daughters and family before turning himself in at Caddo Correctional.

Johnson stated that Pouncey acted like he knew what was going on and was unfazed by how the Chrysler approached. He stated that because of Pouncey's behavior, his fear was heightened. Johnson testified that he was not aiming for Adams; he was just shooting and running.

5

The jury returned a unanimous verdict of guilty of manslaughter. Johnson filed a motion for post verdict judgment of acquittal, arguing the evidence did not permit the finding of guilty. Johnson also filed a motion for new trial, arguing there was insufficient evidence to convict him. Both motions were denied.

Johnson was sentenced as a second felony habitual offender and sentenced to 70 years of imprisonment at hard labor, without benefit of probation or suspension of sentence. The trial court filed written reasons for sentencing, highlighting Johnson's criminal history and lack of remorse. The trial court stated that based on the evidence at trial, Johnson could have been found guilty of second degree murder, which would have been a life sentence. The trial court noted Johnson's violent crime of "carelessly firing at least twelve rounds into a vehicle containing two small children," and the trial court believed Johnson did not understand the seriousness of his crime and had "no reason to believe he will in the future."

Johnson filed a motion to reconsider sentence. He argued that the 70-year sentence was excessive and contrary to the Constitution. Johnson's motion was denied, and he now appeals.

## DISCUSSION

Johnson argues that the State did not prove beyond a reasonable doubt that the homicide was not committed in self-defense. He asserts that he was set up for an unforeseen confrontation that the victim created. Johnson does not contest that he shot Adams and claims it is uncontested that he did not arrive at the scene with the intent to kill. Johnson asserts that he reacted in self-preservation and fear, which is justifiable homicide.

6

The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State v. Ward*, 50,872 (La. App. 2 Cir. 11/16/16), 209 So. 3d 228, *writ denied*, 17-0164 (La. 9/22/17), 227 So. 3d 827. The appellate court does not assess the credibility of witnesses or reweigh evidence. *State v. Bass*, 51,411 (La. App. 2 Cir. 6/21/17), 223 So. 3d 1242. A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. *State v. Alexander*, 51,918 (La. App. 2 Cir. 4/11/18), 247 So. 3d 981, *writ denied*, 18-0805 (La. 2/11/19), 263 So. 3d 436.

When the defendant claims self-defense, the State has the burden to prove beyond a reasonable doubt that the homicide was not committed in self-defense. *State v. Allen*, 50,703 (La. App. 2 Cir. 8/10/16), 200 So. 3d 376, *writ denied*, 16-1734 (La. 9/6/17), 224 So. 3d 981; *State v. Edwards*, 49,635 (La. App. 2 Cir. 2/26/15), 162 So. 3d 512, *writ denied*, 15-0628 (La. 2/5/16), 186 So. 3d 1163. When a defendant claiming self-defense challenges the sufficiency of the evidence on appeal, the question becomes whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the homicide was not committed in self-defense. *Id.*

A homicide is justifiable when committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger. La. R.S. 14:20(A)(1). The possibility of retreat may not

7

be considered as a factor in determining whether or not the defendant had a reasonable belief that deadly force was reasonable and apparently necessary. La. R.S. 14:20(D).

Factors to consider in determining whether a defendant had a reasonable belief that the killing was necessary include the excitement and confusion of the situation, the possibility of using force or violence short of killing, and the defendant's knowledge of the assailant's bad character. *State v. Jones*, 48,458 (La. App. 2 Cir. 11/20/13), 128 So. 3d 593, *writ denied*, 13-2926 (La. 5/30/14), 140 So. 3d 1173.

Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. *State v. Alexander, supra*. The trier of fact is charged with making a credibility determination and may, within the bounds of rationality, accept or reject the testimony of any witness in whole or in part. The reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law. *Id*.

In La. R.S. 14:31(A), manslaughter is defined, in part, as:

(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed;

The jury was given instructions on self-defense, second degree murder, manslaughter, and negligent homicide. The jury rejected Johnson's contention that he shot Adams in self-defense. Johnson was able to present

testimony regarding his history with Adams, which caused him to move around and stay with friends or in hotels. Johnson also testified that because Pouncey had a gun, he felt there was danger. Gardner testified that she and Johnson were both afraid when Adams pulled up beside them.

However, there was conflicting testimony presented regarding whether Johnson was in imminent danger of losing his life or receiving great bodily harm. Small testified that Adams did not have a gun and had not threatened Johnson upon arriving next to their vehicle. Pouncey testified that he did not recall any words exchanged between Johnson and Adams, and "it happened quick." Detectives did not find a gun on Adams or in his vehicle. Adams was found leaning over toward the passenger side of the vehicle, as if trying to escape. Gardner's credibility was called into question because of inconsistencies with her grand jury testimony. Considering the evidence presented at trial, we do not find the jury was erroneous in rejecting Johnson's self-defense claim and finding him guilty of manslaughter. Johnson's arguments are without merit, and we affirm his conviction of manslaughter.

## CONCLUSION

For the reasons stated above, we affirm Antonio Lacedric Johnson's conviction and sentence.

**AFFIRMED.**