Judgment rendered October 23, 2024.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 55,825-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                              Appellee

versus

CHADARIUS MARQUEZ                               Appellant
MOREHEAD

* * * * *

Appealed from the
Fourth Judicial District Court for the
Parish of Ouachita, Louisiana
Trial Court No. 2017F0990

Honorable Bernard Scott Leehy, Judge

* * * * *

LOUISIANA APPELLATE PROJECT          Counsel for Appellant
By: Douglas Lee Harville

CHADARIUS MARQUEZ MOREHEAD            Pro Se

ROBERT STEPHEN TEW                    Counsel for Appellee
District Attorney

HOLLY A. CHAMBERS-JONES
KALEE MORGAN MOORE
GARY ALAN BLAYLOCK
Assistant District Attorneys

* * * * *

Before COX, ROBINSON, and ELLENDER, JJ.

**ROBINSON, J.**

Chadarius Morehead was convicted as charged of second degree murder by a unanimous jury and was sentenced to life imprisonment. For the following reasons, we affirm his conviction and sentence.

**FACTS**

On the afternoon of April 3, 2017, Donteshia Miller dropped off her boyfriend, Kentarius Webb, at the Parkview Apartments ("Parkview") in Monroe, Louisiana. Webb wanted to visit some friends while Miller ran a brief errand. Miller received a phone call about 20 minutes later that Webb had been shot.

Three surveillance cameras at Parkview captured what led up to the shooting, the shooting itself, and the aftermath. The shooting happened at 1:57 p.m.

The defendant, Chadarius Morehead, was shown leaning against the back of a red car in the parking lot in front of building 17 at Parkview. Webb greeted Morehead. Another individual then greeted Morehead and they "spiked," or shook hands. Webb and Morehead had not spiked. Webb appeared agitated, then Morehead stood face to face with Webb briefly before each stepped away. They appeared to exchange some words, then Morehead walked past Webb and took approximately 18 more steps before stopping in a street. Morehead turned around and made a one-handed gesture at Webb. Webb responded by holding his hands out and pointing them at Morehead as he began walking rapidly toward Morehead. Webb lowered his hands after he took several steps. It appeared that Webb was using his left hand to hold up his pants as he walked. His right hand swung freely at his side. As Webb approached Morehead, Morehead moved

forward a few steps but then stepped back. As Morehead stepped back, he pulled out a Taurus handgun from his pants with his right hand and pointed it at Webb. Webb stopped, then started walking backward away from Morehead. Morehead placed his left hand on the gun and began walking toward Webb, who had now turned so that his left side was at an angle to Morehead. Webb continued walking away and gestured to Morehead as if to ask what was happening. As Morehead fired his gun, Webb began running away at full speed.

Webb and others in the area ran toward the front of building 17 to a breezeway. Webb stayed there briefly before he was carried to a nearby car. Meanwhile, Morehead ran around the back of building 17, through the breezeway of building 18, which was directly beyond building 17, and then down a sidewalk toward the breezeway of an apartment at the back of the apartment complex.

Webb succumbed to his injuries at Conway hospital.

Morehead, who was accompanied by an attorney, went to the Monroe Police Department ("MPD") later that day to be interviewed by detectives. Morehead initialed and signed a *Miranda* rights waiver form before being interviewed. Morehead stated that he did not spike Webb when Webb came up to him, which angered Webb, who said he would make Morehead "spike" him. Morehead explained that the pair had "spiking" issues in the past when Webb would not spike him.

Morehead told detectives that as he watched Webb on the day of the shooting, he saw a gun. Asked where he saw the gun, Morehead pointed to his front waistband under his shirt. The gun was black and had a long clip and looked like a Glock. He walked away but Webb followed him and said

2

he would make Morehead fight.  According to Morehead, it appeared that Webb was reaching for his gun and then everything "blanked out."

Morehead claimed that he did not remember anything after he "blanked out" until he slipped while running through a building's breezeway.  The next thing he remembered was that he was under a pile of clothes in the closet of a stranger's apartment.  He did not know for how long he was there.  He jumped a gate and then went to his aunt's home.  He claimed that he had removed his clothing by the time that he got to his aunt's home, where he took a shower.  However, he did not know where he removed his clothes.  Morehead stated that he dropped his gun as he ran through Parkview.

Morehead claimed that he did not remember shooting Webb.  His family had heard that Webb had been picking on him, that Webb had walked up behind him, and that he had shot Webb.

Morehead stated that he could not remember how far apart he and Webb were when Webb said he would make his "bitchass" fight him.  Webb had one hand on his gun as he walked toward him.  Webb was saying he wanted to fight but Morehead thought his body language conveyed something different.  He told Webb not to follow behind him like that with a gun.  He turned around and saw that Webb was still following him and saw the gun, and that was when the "flash" happened.  He did not remember anything from that point until he slipped and fell while running away.

Morehead could not tell if Webb grabbed the gun while puffing his shirt.  Morehead thought it looked like an "attempt."

According to Morehead, in 2016, Webb had threatened Morehead's Uncle Willie and told Morehead that he would "light him up" or threaten to

shoot him if he caught him on a nearby trail. Morehead stated that Webb was known for drug dealing and toting guns. Although he never saw Webb shoot anyone at Parkview, he claimed that he saw Webb pull a gun plenty of times at Parkview.

Morehead stated that he has been around Webb nearly every day since 2016. He would speak to him but not spike him. He told detectives that "they" make slangs to threaten people, but he does not give heed to threats. He just stayed away from Webb because he was afraid of him. They had never fought before.

Morehead told detectives that he did not want to be an innocent person who was shot. He tried to run from this type of stuff. He insisted that he was trying to walk away from Webb. He had his gun since 2016, and always kept the gun with him when he was at Parkview. The "flash" happened when he was trying to walk off and saw Webb was following him and then he saw the gun again.

Morehead was arrested at the conclusion of the interview. He was indicted on July 13, 2017, for the second degree murder of Webb in violation of La. R.S. 14:30.1.

On January 12, 2022, Morehead's trial counsel ("trial counsel") filed a motion to quash the bill of indictment on the grounds that the killing was justifiable under La. R.S. 14:20(A)(1) and (2). He maintained that Webb had threatened and bullied Morehead and his family on several occasions over several years, and on some of these occasions, Webb brandished a weapon and implied his intent to use it on Morehead if given the opportunity at the Parkview apartments. He further maintained that on the day of the shooting, Webb approached Morehead and threatened and insulted him.

4

After Morehead had moved 50 feet away, he realized Webb was pursuing him and continuing to threaten him. When Morehead stopped his retreat and turned toward Webb, he realized that Webb was in possession of a firearm. He argued that camera footage showed Webb raise his shirt and reveal what appeared to be a handgun in his waistband. Morehead fired his weapon at Webb because he was suddenly in fear of being shot.

*Trial*

A jury trial was held in this matter on June 1-2, 2023.

Kris Fulmer, a sergeant with the MPD, has been a detective since 2014 or 2015. He described Parkview as a gated complex located in the middle of nothing.

After learning of the shooting, Fulmer went to the hospital while the rest of his unit went to the scene of the shooting. Donteshia Miller, Webb's girlfriend, told Fulmer how she had learned of the shooting shortly after dropping Webb off at Parkview. Fulmer was told that Jason Elmore had taken Webb to the hospital. An interview of Elmore was conducted at the police station.

Fulmer learned through anonymous tips that Morehead had shot Webb. Fulmer described each building at Parkview as having a large breezeway and staircase to the second floor. Video footage from three surveillance cameras at Parkview was obtained by the MPD.

Fulmer provided a narrative of what the videos were going to show. When the videos were played, they were periodically stopped so he could identify someone or some building.

According to Fulmer, it appeared that Webb did not like it when Elmore and Morehead spiked hands, and it looked like they were talking

about it.  Morehead turned his back and then walked 18 steps away, as counted by Fulmer.  When Morehead reached the roadway, he made a hand gesture which infuriated Webb.  Webb started walking toward Morehead.  As they got closer, Morehead took four steps toward him, but then backed up.  Morehead took the gun out of his pants and put it beside his waist.  Webb stopped and started to back up.  He continued to back up as Morehead pointed the gun at him.  Webb had one hand palm up as if he were asking a question.  As Webb walked away, his body was "bladed" back to Morehead.  Fulmer stated that what he meant by "bladed" was that Webb turned his body so that his ribcage was exposed to Morehead.

Fulmer testified that Morehead then put both hands on his gun.  Webb was turned to Morehead, with both of his hands clearly out, and while the right hand may have been palm down, the left hand was clearly palm up.  As the first shot was fired, Webb started running away and his hand made a motion indicating where he was hit.  As Webb began running, Morehead was moving toward him but then changed direction to get around to the other side of the building.  Webb ran into the breezeway and stopped there.  Morehead ran around building 17 and then through the breezeway of another building, where a separate camera picked him up coming out of another breezeway and running toward the back of the apartments.  Morehead still had his gun in his hand.

Fulmer testified that the video showed Morehead run toward the back of the complex.  He explained that Morehead was running toward a fence, and beyond the fence is a wooded area.

Fulmer testified that he never saw Webb with a gun in the video, and he never saw a gun fall from Webb.  No gun was found at the scene in

6

reference to Webb. Fulmer testified that he looked at the videos to see if a gun fell off or was dropped by Webb as he ran to the breezeway or was recovered by anyone, but he did not see anything.

Fulmer testified that he never saw Webb make a motion to pull a gun from his pants once they were face to face and Morehead pulled his gun out. Webb did not pull out a gun as he was backing up, as he was looking with his left hand open, when he turned away from Morehead and was shot, or when he was running away with Morehead running after him.

Fulmer was shown zoomed-in screen shots taken from the surveillance footage. When he looked at photos of Webb and Morehead standing by the car, he did not see a bulge in Webb's shirt or anything indicating that he was hiding something. He thought Webb's pants were sagging below his waistline and he was pulling up his pants.

Fulmer did not see anything protruding from Webb's shirt when he looked at a photo of Morehead about to draw his weapon. In a photo showing Morehead holding the gun at his side, Webb was facing Morehead with his right hand held above his waistline. Fulmer also commented on the position of Webb's hands in the photos that showed when Morehead began to point the gun at Webb.

Fulmer insisted that he never saw a gun on Webb in any of the photos. He acknowledged that Webb could have been holding his pants up in the same place where Morehead said he saw a gun. Fulmer also agreed that a gun in the pants could cause the pants to sag. Fulmer stated that Webb's right hand was at his beltline or waistline in some photos. Morehead had said he saw the gun around Webb's beltline.

7

Fulmer agreed that a gun could have been passed through the car and handed off when Webb was being loaded into the car. No apartment dumpsters were searched for a gun. He agreed that someone in the breezeway could have taken a gun from Webb.

Fulmer testified that he did not notice any bulging to indicate a weapon on Morehead in the photos even though he was armed.

Fulmer next testified about Morehead's interview, which took place about six hours after the shooting. Fulmer had already obtained an arrest warrant for Morehead before the interview. Morehead was accompanied by his attorney. The audio and video recording of the interview was played for the jury.

Fulmer testified that Morehead's statement that Webb followed him and said he would "make your bitch ass fight me" was inconsistent with what was shown on the video as Webb stayed at the rear of the car the entire time while Morehead walked away. Webb was still at the car when Morehead stopped and made a hand gesture.

Morehead said he saw the gun when Webb's hand motion caused his shirt to come up while Morehead was walking away. It sounded to Fulmer that Morehead saw Webb's gun before he took the 18 steps. Morehead said he saw the gun in the front of Webb's pants. He described it as a Glock with an extended magazine. Fulmer testified that an extended magazine is around more or less the length of an extra magazine. Fulmer thought a gun would have been very visible for Morehead to know the make of it. Fulmer would not think a person was trying to conceal his weapon if his Glock with an extended magazine in front of his pants was visible.

8

Fulmer testified that the first photo did not comport with what Morehead said about Webb having a gun as it did not appear that he had a gun in front of his pants. Fulmer noted that Morehead never said he saw the gun in Webb's hand. Although Webb lifted up his shirt one time, his right hand was not fluffing up his shirt.

Morehead complained to the detectives that Webb had thrown off Morehead's hand in 2016. Webb then threatened to "light him up," or shoot him, if he caught Morehead on a trail. Fulmer explained there are trails behind Parkview and from neighborhood to neighborhood, and a lot of the trails are in wide open areas. Fulmer recalled that Morehead really did not give an answer when asked if Webb had made any other threats toward him.

Fulmer stated that Morehead knew Webb to be someone who carried a gun. He also knew people were dying from gunshots in Parkview. He was trying to get away from Webb.

Fulmer testified that Morehead stated that he had his gun tied inside his shorts so nobody could see it. Morehead said his gun was in Parkview, so he would have lost the gun between when he ran out of building 18's breezeway and wherever he went. His aunt's residence was not far away in the direction behind Parkview, at most a quarter mile according to Fulmer. Fulmer testified that if they had the gun then they could have linked it to the shell casings.

Chris Turner was a crime scene investigator for the MPD in 2017. He testified that he photographed the scene, marked casings, and looked for additional evidence. He found eight 9mm casings. Even with the naked eye, he was able to see that the primer marks matched or were consistent among the casings. A lead fragment was found under a windowsill.

9

Turner testified that after detectives watched the video and knew there was one shooter, he laid the cones out from where Morehead was initially standing to where he stopped shooting before fleeing. He explained that the casings gave an idea, but not the exact location, of where Morehead was when each shot was fired. Photographs of the crime scene were introduced into evidence.

Dr. Frank Peretti, who performed Webb's autopsy, testified as an expert in forensic pathology and autopsy. The cause of Webb's death was two gunshot wounds to the torso. Dr. Peretti described both wounds as distant wounds. The bullets involved vital organs and blood vessels, which resulted in internal bleeding. There was no other evidence of injury.

Dr. Peretti's autopsy report was accepted into evidence. It listed a gunshot wound to the left lower back, with the exit wound in the right lower quadrant of the abdomen. No bullet or bullet fragments were recovered. The trajectory was back to front, left to right, and slightly upward. The other gunshot wound was to the left lower quadrant of the abdomen, with the exit wound to the right buttock. The trajectory was front to back, left to right, and downward.

Dr. Peretti testified that he did not determine the sequence of shots. The bullet which created the gunshot wound to the left lower quadrant of the abdomen involved the left iliac artery and vein and was why he had two liters of blood in his abdomen. He testified that one wound was a rear-facing wound. The other wound, which he described as a forward-facing wound, occurred when Webb was either facing Morehead or slightly turned.

The state's last witness was Webb's girlfriend, Donteshia Miller. She had been in a relationship with him since 2011, and they were living

together at the time of his death. She recalled that Webb purchased a t-shirt the morning of the shooting. He wore that shirt over a tank top. She testified that Webb did not have a gun on him as she saw him dress and was with him from the time he dressed until she dropped him off at Parkview. She described Webb as a peaceful person who had been in the United States Marine Corps.

Morehead called no witnesses after the state rested. Morehead was convicted as charged by a unanimous jury on June 2, 2023.

Trial counsel filed a motion for judgment of acquittal in which he argued that at most, the evidence supported a charge of manslaughter, and that the video admitted into evidence was not properly authenticated and this was an error prejudicial to Morehead. The motion was denied.

Trial counsel also filed a motion for new trial. He argued that the surveillance footage was improperly admitted into evidence because the state did not produce a proper witness to testify as to the authenticity of the video under La. C.E. art. 901(1). He further argued that the trial court erred in barring Louisiana State Police Trooper Matt Jones from testifying about Webb's 2015 arrest in which he was in possession of a Glock 9mm handgun. Webb told Jones that he carried the handgun for his protection. Finally, trial counsel argued that the evidence, at most, supported a charge of manslaughter because the preponderance of the evidence showed that Morehead acted in the "heat of blood" and "sudden passion." The motion was denied.

Morehead was sentenced to life imprisonment without the benefit of parole. Trial counsel filed a motion to reconsider sentence, which was denied.

11

Trial counsel timely filed a motion for appeal. Morehead's appeal counsel ("appeal counsel") raised one assignment of error. He argues that the state failed to prove beyond a reasonable doubt that Morehead did not shoot Webb in self-defense.

Morehead filed a *pro se* brief in which he raised three assignments of error. He first argues that the trial court erred in allowing the surveillance video footage and photos into evidence when they were not properly authenticated. He next argues that the trial court erred when it did not allow him to present testimony concerning Webb's arrest and admission to Trooper Jones that he carried a firearm for protection. Finally, he contends the trial court erred in not ordering the court reporter to transcribe the parts of his interview that were played to the jury.

As requested by this court, the state and appeal counsel have filed supplemental briefs addressing the issues raised in Morehead's *pro se* brief.

## DISCUSSION

*Sufficiency of the evidence*

Appeal counsel argues that Morehead believed that Webb, who approached Morehead in a hostile manner and was making threats, was pulling a weapon from his waistband to shoot Morehead. Webb was angry because Morehead would not shake his hand and threatened to make Morehead shake his hand. Webb followed him after he tried to walk away. Webb had threatened him before and was known to carry a weapon. Appeal counsel further argues that the state presented no eyewitness testimony, but instead relied on a play-by-play analysis of the video by Fulmer. Appeal counsel maintains that it was reasonable for Morehead to assume he was

12

likely to suffer at least great bodily injury if he allowed Webb to draw his weapon.

The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State v. Tate*, 01-1658 (La. 5/20/03), 851 So. 2d 921, *cert. denied*, 541 U.S. 905, 124 S. Ct. 1604, 158 L. Ed. 2d 248 (2004). This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. *State v. Pigford*, 05-0477 (La. 2/22/06), 922 So. 2d 517; *State v. Dotie*, 43,819 (La. App. 2 Cir. 1/14/09), 1 So. 3d 833, *writ denied*, 09-0310 (La. 11/6/09), 21 So. 3d 297.

The trier of fact makes credibility determinations and may accept or reject the testimony of any witness. *State v. Casey*, 99-0023 (La. 1/26/00), 775 So. 2d 1022, *cert. denied*, 531 U.S. 840, 121 S. Ct. 104, 148 L. Ed. 2d 62 (2000). The appellate court does not assess credibility or reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So. 2d 442; *State v. Green*, 49,741 (La. App. 2 Cir. 4/15/15), 164 So. 3d 331. A reviewing court accords great deference to the trier of fact's decision to accept or reject the testimony of a witness in whole or in part. *State v. Jackson*, 53,497 (La. App. 2 Cir. 5/20/20), 296 So. 3d 1156.

Direct evidence provides proof of the existence of a fact, for example, a witness's testimony that he saw or heard something. *State v. Lilly*, 468 So. 2d 1154 (La. 1985). Circumstantial evidence provides proof of collateral

facts and circumstances, from which the existence of the main fact may be inferred according to reason and common experience. *Id.* When the state relies on circumstantial evidence to establish the existence of an essential element of a crime, the court must assume every fact that the evidence tends to prove and the circumstantial evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438; *State v. Lilly*, *supra*; *State v. Green*, *supra*.

Second degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. La. R.S. 14:30.1(A)(1). Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant. *State v. Walker*, 53,975 (La. App. 2 Cir. 6/30/21), 321 So. 3d 1154, *writ denied*, 21-01334 (La. 11/23/21), 328 So. 3d 83. The determination of whether the requisite intent is present in a criminal case is for the trier of fact, and a review of this determination is to be guided by the standards of *Jackson v. Virginia*. *Id.*

Morehead does not dispute that he killed Webb. Instead, he claims that he acted in self-defense.

A homicide is justifiable when it is committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger. La. R.S. 14:20(A)(1). Regarding whether retreat is required, La. R.S. 14:20 states:

14

C. A person who is not engaged in unlawful activity and who is in a place where he or she has a right to be shall have no duty to retreat before using deadly force as provided for in this Section, and may stand his or her ground and meet force with force.

D. No finder of fact shall be permitted to consider the possibility of retreat as a factor in determining whether or not the person who used deadly force had a reasonable belief that deadly force was reasonable and apparently necessary to prevent a violent or forcible felony involving life or great bodily harm or to prevent the unlawful entry.

When self-defense is raised as an issue by the defendant, the state has the burden of proving, beyond a reasonable doubt, that the homicide was not perpetrated in self-defense. *State ex rel. D.P.B.*, 02-1742 (La. 5/20/03), 846 So. 2d 753; *State v. Allen*, 50,703 (La. App. 2 Cir. 8/10/16), 200 So. 3d 376, *writ denied*, 16-1734 (La. 9/6/17), 224 So. 3d 981. When the defendant challenges the sufficiency of the evidence in a self-defense case, the question becomes whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the homicide was not committed in self-defense. *State v. Matthews*, 464 So. 2d 298 (La. 1985); *State v. Allen*, *supra*.

A rational trier of fact could have found beyond a reasonable doubt that the killing of Webb was not committed in self-defense. The evidence was also sufficient to support Morehead's second degree murder conviction.

Appeal counsel argues that Webb created the incident when he threatened Morehead with physical harm if he did not shake his hand and then aggressively closed much of the distance that Morehead had created between them. However, this only tells part of the story as it ignores what occurred and did not occur once Morehead drew his weapon.

When presented with Morehead's threat as an armed individual, Webb did not pull out a gun. Instead, he stopped in his tracks. He began walking

15

backward as Morehead placed both hands on his gun and approached him, and then began running away as the first shot was fired. Morehead fired eight times, with one bullet striking Webb in the back.

Webb was no longer a threat to Morehead, if he ever was one, when Morehead made the decision to pull out his handgun that had been concealed in his pants. This assignment of error is without merit.

*Authentication*

Fulmer testified that the recordings from Parkview were loaded from their system and then loaded onto the MPD's evidence system. Another detective had obtained the video footage from Parkview's system.

Defense counsel objected to the admission of the videos into evidence on the ground of lack of authentication. The objection was overruled without any argument. A continuing objection was made concerning the USB-drive exhibit containing the videos. After all the videos were introduced, defense counsel stated that he was objecting to the authenticity of the videos and any photos that may come from the videos. He argued that photos and videos must be authenticated through either a custodian who had care and control and would have produced the item, or a witness who can say that is an accurate representation of what occurred. The state responded that Fulmer indicated that he had investigated numerous homicides at Parkview, he was familiar with Parkview's recording system, and he had been to Parkview so he knew what was displayed. The state added that a later witness, Detective Chris Turner, would testify that he downloaded the recordings. The court overruled the objection, with the court stating it had no doubt as to the authenticity of the videos.

Turner testified that he went to Parkview and collected the video. Another detective had viewed the footage but could not download it, so he asked Turner to do it since he was familiar with surveillance systems. Turner explained that Parkview's surveillance system was not cloud-based, but footage was recorded to a DVR hard-drive at the Parkview office. He downloaded the video for the date and time of the shooting onto a USB drive, and once he got to his office, he uploaded the video into the MPD system. He did not make a copy of the video from the MPD system.

La. C.E. art. 901(A) states "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Paragraph B of art. 901 provides examples of authentication or identification conforming with the requirements of the article. The first example given is testimony by a witness with knowledge that a matter is what it is claimed to be.

Absent a clear abuse of discretion, a trial judge's determinations concerning relevancy and admissibility should not be overturned. *State v. Cosey*, 97-2020 (La. 11/28/00), 779 So. 2d 675.

Appeal counsel argues that the state failed to offer testimony from any witness who could establish that the videos and photographs fairly and accurately represented Parkway's surveillance footage from the date and time of the shooting. Appeal counsel notes that Turner never downloaded the footage to the USB drive that was played for the jury and admitted into evidence. Turner was never shown the USB drive or the photos taken from the surveillance videos. Appeal counsel argues that Fulmer was unable to authenticate the videos and photos as fairly and accurately capturing what

Turner had downloaded at Parkview because he first saw the videos at the police station and never reviewed the surveillance footage at Parkview.

In the unpublished opinion of *State v. Mitchell*, 23-415 (La. App. 3 Cir. 4/11/23), 2023 WL 11018370, the appellate court rejected the defendant's argument that authentication of surveillance videos required the person whose equipment recorded the video to be called as a witness to authenticate the evidence. In that matter, detectives testified about retrieving surveillance recordings and provided firsthand accounts of the recovery of the videos. In addition, each officer described what was captured on the surveillance, how it was captured, and how they determined the video's accuracy. The court noted that under La. C.E. art. 901(B)(1), testimony of a witness with knowledge that the evidence is what it is purported to be is sufficient to authenticate the evidence.

Fulmer testified that he had investigated many shootings at Parkview. He was also familiar with the placement of cameras there, explaining that most of the cameras were mounted to poles at that time, and that one camera was maybe 12 feet high. On the video, he was able to identify Moorehead, Webb, and Jason Elmore,[1] a witness with whom he had spoken initially at the hospital.

Turner testified how he downloaded the video footage at Parkview to a USB drive and then uploaded it to the MPD's system. Although Turner did not testify that the USB drive admitted into evidence was the original USB drive or had the video downloaded to it from the MPD's system, we note that a defect in the chain of custody goes to the weight of the evidence

---

[1] A material witness warrant was twice issued for Elmore, but authorities were only able to apprehend him the first time.

18

rather than to its admissibility.  *See State v. Holliday*, 17-01921 (La. 1/29/20), 340 So. 3d 648.

Under these circumstances, we conclude that the videos and photos were properly authenticated through the testimony of a witness with knowledge pursuant to La. C.E. art. 901(B)(1).  The trial court did not abuse its discretion in admitting them into evidence.

Interestingly, Morehead told detectives that Parkview had cameras that would show what happened.  In addition, his statement to police was largely consistent with what was shown on the videos.

### Character of victim

Appeal counsel adopts the portion of the *pro se* brief contending that the trial court erred when it excluded testimony and evidence pertaining to Webb's prior threats against Morehead and his prior arrest and conviction related to possession of drugs and a firearm.

Appeal counsel refers to Webb's threat in 2016 to shoot Morehead on the trails.  We note that the jury heard about this when Morehead's statement to the police was played to the jury.  This had been the subject of a motion in limine filed by the state that was directed at what was said during Morehead's interview by police.  The court ruled that it would allow evidence of Webb's general character as well as evidence of specific threats made by him against Morehead.  The court further ruled that Morehead was entitled to have the entire recorded statement played, except the parts subject to attorney-client privilege.  Defense counsel agreed not to ask questions regarding other acts outside of what Morehead said in his interview.

Defense counsel wanted to call Trooper Jones to testify about Webb's 2015 arrest for possession with intent to distribute and possession of a

19

firearm. The state filed a motion in limine to exclude this testimony. Defense counsel argued that the finding of the handgun during Webb's arrest corroborated what Morehead told detectives about Webb being known for selling drugs and carrying a Glock. The trial court granted the motion in limine as to the arrest and conviction. The court ruled that the probative value was negligible and it was unduly prejudicial, so it would not be allowed. We conclude that the trial court did not abuse its discretion in not allowing Trooper Jones to testify about the 2015 arrest.

### Transcript of interview video

Morehead contends the trial court erred in not ordering the court reporter to transcribe the parts of his interview video that were played to the jury. We find no merit to this contention. There is no indication in the record that the entire video was not played to the jury.

### Error patent

La. R.S. 14:30.1 states that the punishment for second degree murder shall be life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. Morehead's sentence was not imposed at hard labor. In addition, it was imposed only without benefit of parole, but did not include the additional required conditions of without benefit of probation or suspension of sentence.

The failure of the trial court to impose a sentence at hard labor and to include without benefit of probation or suspension of sentence made the sentence illegally lenient. A defendant in a criminal case does not have a constitutional right or a statutory right to an illegally lenient sentence. *State v. Williams*, 00-1725 (La. 11/28/01), 800 So. 2d 790; *State v. Burns*, 53,250 (La. App. 2 Cir. 1/15/20), 290 So. 3d 721. An illegal sentence may be

20

corrected at any time by the court that imposed the sentence or by an appellate court on review. La. C. Cr. P. art. 882(A). This correction may be made despite the failure of either party to raise the issue. *See State v. Williams*, *supra*.

Because La. R.S. 14:30.1 is a mandatory felony requiring any sentence to be served at hard labor, the error is harmless and self-correcting. *State v. Ramsey*, 55,491 (La. App. 2 Cir. 2/28/24), 381 So. 3d 308, *writ denied*, 24-00379 (La. 10/1/24), 2024 WL 4355004.

When the trial court fails to order that a sentence be served without benefits as statutorily mandated, the sentence will be automatically served without benefits for the requisite time period. La. R.S. 15:301.1(A); *State v. Dowles*, 54,483 (La. App. 2 Cir. 5/25/22), 339 So. 3d 749. Thus, the trial court's failure to declare that Morehead's sentence was to be served without benefit of probation or suspension of sentence is harmless error and self-correcting.

## CONCLUSION

For the foregoing reasons, Morehead's conviction and sentence are **AFFIRMED**.