Judgment rendered April 9, 2025.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 56,201-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                          Appellee

versus

TRADAVION DEANTHONY                         Appellant
HUGHES

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 380,133

Honorable Ramona L. Emanuel, Judge

* * * * *

LOUISIANA APPELLATE PROJECT               Counsel for Appellant
By: Chad M. Ikerd

JAMES E. STEWART, SR.                      Counsel for Appellee
District Attorney

SENAE DENEAL HALL
ERIC MATTHEW WHITEHEAD
FERNANDO BERNARD GRIDER, JR.
Assistant District Attorneys

* * * * *

Before STONE, STEPHENS, and MARCOTTE, JJ.

MARCOTTE, J.

This criminal appeal arises from the First Judicial District Court, Parish of Caddo, the Honorable Ramona Emanuel presiding. Defendant Tradavion Hughes ("Hughes") was convicted of second-degree murder and sentenced to life imprisonment at hard labor without benefits. He now appeals his conviction and sentence. For the following reasons, we affirm.

**FACTS AND PROCEDURAL HISTORY**

On March 25, 2021, Hughes was charged by bill of indictment with the second-degree murder of Eric Brownlee, Jr. ("Brownlee"), in violation of La. R.S. 14:30.1. The offense occurred on December 6, 2020. Hughes pled not guilty.

From October 30 to November 1, 2023, a trial was held where the following evidence was adduced. Nakia Hall ("Hall") testified that she was engaged to Brownlee on the date of his death; they had been dating for eight years. In the early hours of December 6, 2020, she and Brownlee stopped at the Clark Gas Station on Jewella Avenue in Shreveport, Louisiana. Hall entered the gas station's store to buy lottery tickets and returned to their car, which was parked at the gas pumps to the right of the store. Brownlee stood outside the entrance to the store to speak with some people he knew. Hall stated that she saw Brownlee "being jumped on" by four or five people, and she tried to intervene. She got out of the car and started shouting for them to stop; she then drew a handgun.

Hall testified that she was tackled by someone, kicked, and then her gun was taken. The state entered still photographs from the gas station's surveillance videos into evidence. Hall said the photos depicted her entering the store, the person who shot Brownlee, and her and Brownlee in a physical

altercation with others.  Hall identified Hughes as the person who shot

Brownlee.  Hall stated that she did not see what started the fight.

Corporal Jonathan Varnell ("Cpl. Varnell") testified that he was

employed by the Shreveport Police Department ("SPD") in its Crime Scene

Investigation Unit as a detective.  He responded to a shooting at the Clark

Gas Station on December 6, 2020.  Several photos of the crime scene were

admitted.  They depicted Brownlee's car parked at a gas pump located on

the right side of the gas station's store entrance.  The photos also showed

that, in front of the doors to the gas station, there was blood, expended 9 mm

projectile casings, and one projectile.  The gas station surveillance videos

were admitted and played for the jury.[1]  One surveillance video was

recorded by a camera located inside the store and showed the double glass

doors at the entryway to the store and the outside area in front of the store.

The second surveillance video was recorded by a camera located outside the

store and showed the outside area in front of the store and some of the gas

pumps to the right of the store.  The videos presented the altercation and

shooting which occurred outside at the front of the store.

Hughes entered the store with the handle of a handgun sticking out of

the right pocket of his pants.  He exited the store and stood near the entrance

beside a silver truck, conversing with others.  Brownlee, who was standing

near the truck, approached him and reached for the gun in Hughes' pocket.

Hughes, Fredis Vercher ("Vercher"), and a third man (later identified as

"Ray" or "Juan") then jumped on Brownlee.  They beat him and attempted

to take the gun away.  Hall approached the four men, tried to intervene, and

---

[1] Akram Abdalla testified that he was not present when Brownlee was shot, but he
provided the gas station's video surveillance footage of the shooting to SPD.

then pulled out a handgun from under her shirt near her waist. Ray/Juan tackled her, and the two grappled for her gun. After several seconds, Hughes left the altercation with Brownlee and ran to where Hall was struggling with Ray/Juan. Hughes kicked Hall several times and took her gun. He returned to Vercher and Brownlee, who were on the ground in front of the doors to the store; the pair were still wrestling over Hughes' gun. Hughes cocked Hall's gun.

Hughes leaned over the pair on the ground, speaking to Brownlee. Hall returned to assist Brownlee and tried to get her gun from Hughes. Ray/Juan pulled her by her hair away from Brownlee. Hall broke away from the group, Hughes then shot Brownlee in his leg, and Hall entered the store. Hughes stood by Brownlee and Vercher, who were still grappling on the ground; Ray/Juan also stood near Brownlee and Vercher, but he was bent over the pair. Two seconds after Hall re-entered the store, Hughes reached between Vercher and Brownlee and appeared to fire the gun a second time. Brownlee sustained a gunshot wound to his lip, and his mouth appeared bloody in the video after Hughes fired a second shot. Vercher pulled the gun away from Brownlee, it slid along the pavement, and stopped in front of the truck's back tire, which was several feet away from Brownlee. Vercher retrieved the gun, and he and Ray/Juan exited the area displayed by the videos.

Brownlee sat up and raised his hands, which were empty, and exchanged words with Hughes for 9 to 10 seconds. While standing over Brownlee, who remained seated on the ground, talking and gesturing with his hands, Hughes shot him in the left cheek at point blank range. Brownlee

3

fell to the ground and did not move again.  Hughes left the scene.  The altercation lasted 1 minute and 23 seconds.

Cpl. Varnell testified that he received Hughes' name through a Crime Stoppers' tip.  He interviewed Hughes and provided the following summary of Hughes' statement (verbatim):

> He advised that he was there at the store for a period of time. He went and bought some cigarettes.  Eric [Brownlee] was there.  He stated that when he started handing out cigarettes, Eric tried to grab his gun.  So him, who he called Fred [Vercher], and Ray went to Eric to try to get the gun back. That's when his Ms. Hall came [and] introduced her weapon to the incident.  Ray went and engaged her.  Mr. Hughes stated he left the initial encounter with Eric and went to Ms. Hall, kicked her a few times, was able to get the gun from her, went back to Eric where he shot him in the leg, shot him once again.  And then prior to the final shot, he stated that Eric said if he didn't kill him that he would kill him later and that's when he shot and killed him.

The video of Hughes' statement was as Cpl. Varnell described. Hughes also said that his father was shot and killed during a robbery a couple of years prior, and he was very scared when Brownlee told him that he was going to kill him.  Cpl. Varnell said that another Crime Stoppers' tip led them to Vercher.  Cpl. Varnell attempted to interview Vercher through his attorney but was unsuccessful.  Cpl. Varnell said that the murder weapon was not recovered.

Dr. James Traylor ("Dr. Traylor") was accepted as an expert in forensic pathology and stated that he performed the autopsy on Brownlee. He testified that Brownlee's manner of death was homicide, and his cause of death was two gunshot wounds to his face.  The first shot to Brownlee's face entered at the left corner of his mouth at his upper lip, breaking a tooth and exited at the right side of his chin.  The bullet re-entered his body near his right clavicle.  The second shot to Brownlee's face, the final shot that

4

Hughes fired, which was fatal, entered just below Brownlee's left eye, exited beneath the right side of his chin, and re-entered his body just below his right clavicle, hitting his right subclavian artery. Hughes' first and second shots to Brownlee's face exited at nearly the same place on his chin and re-entered his body at the same place below his clavicle. Dr. Traylor estimated that the bullets were fired approximately 6 to 18 inches from Brownlee's face, based upon the presence of gunpowder particles on the victim.

Dr. Traylor noted that Brownlee had abrasions on his right hand. He also stated that he did not notice a wound to Brownlee's leg during the autopsy. However, photos taken by police at the hospital just after Brownlee died showed a wound to his left leg.

On cross-examination, Dr. Traylor stated that Brownlee was alive when he got to the hospital where hospital staff performed procedures to preserve his life. He testified that Brownlee was given therapeutic levels of ketamine and fentanyl during that treatment, which explains why his toxicology screening showed the presence of those substances. The state rested.

Vercher testified that he knew both the victim and defendant. He stated that he went to the Clark Gas Station on the night of Brownlee's death to purchase snacks. He was at the store for about 45 minutes. He saw Brownlee take Hughes' gun and attempted to intercede to break up the fight. Vercher stated that a woman "popped out" with a gun and pointed it at them. He said that someone tried to grab the firearm from her. He testified that, at that point, he was on the ground, and he could not get up because Brownlee had his leg pinned. Vercher said that he heard maybe two gunshots. He

5

stated that when the first gunshot was fired, Brownlee did not react like he had been shot.

On cross-examination, Vercher affirmed that SPD arranged to interview him, but he did not show up. When questioned about whether he retrieved the firearm from under his truck, Vercher said he did not recall.

Following a colloquy, Hughes elected not to testify in his own defense. The defense rested. The trial court read its charge to the jury, which included instructions as to self-defense, the aggressor doctrine, and the definitions of second-degree murder, manslaughter, and negligent homicide. The jury began its deliberations but returned to the courtroom to ask the court to recite the legal definition of manslaughter. The court complied, and the jury continued to deliberate. The jury returned a verdict of guilty as charged. The jury was polled, and the verdict was unanimous.

Hughes filed pro se motions for a post-verdict judgment of acquittal and for a new trial. He filed counseled motions to request deviation from the mandatory life sentence, for a post-verdict judgment of acquittal, and for a new trial. On January 10, 2024, Hughes was before the court for sentencing. The trial court denied his motions. The trial court asked Hughes if he was ready for sentencing, and he stated that he was. The court sentenced Hughes to life imprisonment without benefits, with credit for time served. The trial court informed him of his appellate and post-conviction relief time constraints. Hughes filed a motion to reconsider sentence which was denied. He now appeals.

**DISCUSSION**

*Insufficient Evidence*

Hughes first argues that there was insufficient evidence to prove he was guilty of second-degree murder. Hughes argues that he and those participating in the fight were not the aggressors, and his killing of Brownlee was justified. Defendant says that while he was fighting with Hall, his gun was taken from Brownlee, which he argues the surveillance videos show he did not see. Hughes states that, once her gun was taken away, Hall returned to the fight with Brownlee. Hughes maintains that after Brownlee was shot twice and sat up, he made aggressive hand gestures and told Hughes that he would kill him later if Hughes did not kill him right then, which gave him a reasonable belief that Brownlee continued to present a danger to him. Hughes states that, at that time, he did not know where his gun was, but he acknowledges that Brownlee did not have a gun in his hands. Hughes asks this court to find that he acted in self-defense and overturn his conviction.

The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State v. Tate*, 01-1658 (La. 5/20/03), 851 So. 2d 921, *cert. denied*, 541 U.S. 905, 124 S. Ct. 1604, 158 L. Ed. 2d 248 (2004). This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. *State v. Pigford*, 05-0477 (La. 2/22/06), 922 So. 2d 517; *State v. Dotie*,

7

43,819 (La. App. 2 Cir. 1/14/09), 1 So. 3d 833, *writ denied*, 09-0310 (La. 11/6/09), 21 So. 3d 297.

The trier of fact makes credibility determinations and may accept or reject the testimony of any witness. *Id.* The appellate court does not assess credibility or reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So. 2d 442; *State v. Morehead*, 55,825 (La. App. 2 Cir. 10/23/24), __So. 3d __, 2024 WL 4549403, *writ denied*, 24-01434 (La. 2/19/25), __ So. 3d __, 2025 WL 547107. A reviewing court accords great deference to the trier of fact's decision to accept or reject the testimony of a witness in whole or in part. *State v. Jackson*, 53,497 (La. App. 2 Cir. 5/20/20), 296 So. 3d 1156.

Second-degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. La. R.S. 14:30.1(A)(1). Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant. *State v. Walker*, 53,975 (La. App. 2 Cir. 6/30/21), 321 So. 3d 1154, *writ denied*, 21-01334 (La. 11/23/21), 328 So. 3d 83. The determination of whether the requisite intent is present in a criminal case is for the trier of fact, and a review of this determination is guided by the standards of *Jackson v. Virginia*. *Id.* The shooting of a firearm at close range and aimed at the person is indicative of specific intent to kill or inflict great bodily harm upon the victim. *State v. Cotton*, 55,435 (La. App. 2 Cir. 1/10/24), 379 So. 3d 224.

Hughes does not dispute that he killed Brownlee. Instead, he claims that he acted in self-defense.

8

Louisiana Revised Statute 14:20(A)(1) provides that a homicide is justifiable:

> When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.

Factors to consider in determining whether a defendant had a reasonable belief that the killing was necessary include the excitement and confusion of the situation, the possibility of using force or violence short of killing, and the defendant's knowledge of the assailant's bad character. *State v. Crow*, 52,817 (La. App. 2 Cir. 6/26/19), 278 So. 3d 416.

When self-defense is raised as an issue by the defendant, the state has the burden of proving, beyond a reasonable doubt, that the homicide was not perpetrated in self-defense. *State ex rel. D.P.B.*, 02-1742 (La. 5/20/03), 846 So. 2d 753; *State v. Allen*, 50,703 (La. App. 2 Cir. 8/10/16), 200 So. 3d 376, *writ denied*, 16-1734 (La. 9/6/17), 224 So. 3d 981. When the defendant challenges the sufficiency of the evidence in a self-defense case, the question becomes whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the homicide was not committed in self-defense. *State v. Matthews*, 464 So. 2d 298 (La. 1985); *State v. Morehead*, *supra*.

In the present case, the court instructed the jury as to self-defense and the aggressor doctrine. Counsel presented the jury with two versions of the shooting. The state argued Hughes shot Brownlee without justification. The defense argued the homicide was committed in self-defense, that is, Brownlee snatched Hughes' gun from his pocket which started a fight to get control of the gun which lasted 90 seconds. The defense further argued that

Hughes feared for his life when Brownlee snatched his gun and when Hall approached with a second gun which she brandished at the group fighting over Hughes' gun. The defense said that Hughes shot Brownlee to break up the fight, but the first two shots did not faze the victim. The defense said that Brownlee, having been shot twice, sat up, stared at an armed Hughes, and threatened to kill him if he did not kill him first.

The jury chose to credit the state's argument rather than defendant's, and this court agrees that a rational trier of fact could have found beyond a reasonable doubt that the killing of Brownlee was not committed in self-defense. The evidence was also sufficient to support Hughes' second-degree murder conviction.

There is no question here that Hughes shot and killed Brownlee; he admitted that he did so in his statement to SPD. The jury was tasked with considering whether defendant killed the victim because he reasonably believed that he was in imminent danger of losing his life, and Hughes was unable to persuade the members of the jury that he acted in self-defense.

Hughes contends, and we agree, that Brownlee was the initial aggressor in the altercation when he stole Hughes' handgun from his pocket. This court's concern is not about how the dispute began, but how it ended.

Hughes' argument to this court is that it was Vercher who disarmed Brownlee while defendant was fighting with Hall; therefore, he did not know where the gun was when he shot Brownlee a third time. However, the surveillance videos show that Vercher disarmed Brownlee about 18 seconds *after* Hughes rejoined the fight between Vercher and the victim. Ten seconds after that, Hughes fired his third shot, killing Brownlee.

10

During the 10 seconds prior to Hughes shooting Brownlee a third time: (1) Brownlee was sitting on the ground with both of his hands raised in Hughes' direction; (2) Hughes stood over Brownlee, facing him; (3) the pair exchanged words; (4) Brownlee's hands were empty, and he was gesturing with his hands while he was speaking with Hughes; and (5) Brownlee did not make any sudden moves toward Hughes or attempt to access a gun.

The surveillance videos show that Hughes was at close range and aimed the gun at Brownlee's head when he fired his last shot. Those facts confirm that Hughes had the requisite specific intent to kill or inflict great bodily harm to the victim who was unarmed and sitting on the ground. We find that Hughes did not act in self-defense and the evidence was sufficient to support his conviction of second-degree murder.

*Manslaughter*

In the alternative, Hughes argues he should have been found guilty of the lesser, included offense of manslaughter. He contends that the entire confrontation lasted 90 seconds, and it was not realistic to believe that a reasonable person's blood would have cooled in such a short timeframe and under such stressful circumstances. He argues that there were two guns that Brownlee and Hall had control over with unknown intentions during the struggle and Brownlee did not back down or attempt to disengage from the fight. He asserts that he proved by a preponderance of the evidence that there was sufficient provocation and lack of time to reflect on the circumstances and act coolly.

Manslaughter is a homicide which would be either first-degree murder or second-degree murder, but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an

11

average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed. La. R.S. 14:31(A)(1).

"Sudden passion" and "heat of blood," which distinguish manslaughter from homicide, are not elements of the offense, but mitigatory factors exhibiting a degree of culpability less than is present when the homicide is committed without them. *State v. Tompkins*, 403 So. 2d 644 (La. 1981); *State v. Keen*, 55,915 (La. App. 2 Cir. 11/20/24), __ So. 3d __, 2024 WL 4830414. Provocative acts held to rise to the level of mitigating conduct involve physical threats or actions on the part of the victim. *State v. Ramsey*, 55,491 (La. App. 2 Cir. 2/28/24), 381 So. 3d 308, *writ denied*, 24-00379 (La. 10/1/24), 393 So. 3d 865. Mere words or gestures, however offensive or insulting, will not reduce homicide from murder to manslaughter. *State v. Smith*, 49,839 (La. App. 2 Cir. 5/20/15), 166 So. 3d 416, *writ denied*, 15-1244 (La. 6/3/16), 192 So. 3d 753. Provocation and the time for cooling are questions for the trier of fact to determine according to the standard of the average or ordinary person. *State v. Jones*, 56,042 (La. App. 2 Cir. 12/18/24), __ So. 3d __, 2024 WL 5150179.

Brownlee's killing was not the product of a sudden passion or heat of blood which deprived Hughes of his self-control or cool contemplation. Brownlee's verbal threats, if true, were insufficient to reduce Hughes' crime to the lesser offense of manslaughter. The jury heard Hughes' statement to SPD in which he said that Brownlee threatened him and he was afraid. The jury did not believe that Brownlee's alleged last words constituted a

12

provocation that deprived Hughes of his self-control and cool reflection in firing the final shot that killed Brownlee

At that time, Hughes had already shot Brownlee twice. Brownlee was sitting on the ground with his empty hands in the air in front of him. Hughes stood over the victim, who made no further attempt to harm anyone or get a weapon; they exchanged words for 10 seconds before Hughes shot Brownlee a third time. When Hughes shot Brownlee a third time, all other people originally involved in the struggle had fled the immediate vicinity. After viewing the surveillance video, we believe that 10 seconds is crucial in concluding that Hughes' conduct in killing Brownlee constituted second-degree murder rather than manslaughter. Hughes, while standing over Brownlee, was able to have a conversation with him and see that he was not armed. Hughes could have chosen to walk away, but he instead shot Brownlee a final time, killing him.

The trial transcript reveals that the jury asked the court to provide it with the definition of manslaughter, deliberated for another 20 minutes, and then returned a verdict of guilty of second-degree murder. The jury considered finding Hughes guilty of manslaughter and rejected that verdict. We cannot say that the jury erred in rendering its verdict. Defendant's conviction and sentence are affirmed.

*Error Patent*

The record was reviewed for errors patent, and one was found. The record shows that the trial court failed to observe the 24-hour sentencing delay under La. C. Cr. P. art. 873, and there was no express waiver of the delays by defendant. But, when asked by the trial court if he was ready for sentencing, Hughes affirmed that he was. He did not object to the trial

13

court's failure to observe the delay, and there was no showing of prejudice. Thus, the trial court's failure to observe the 24-hour delay was harmless error. *See State v. Carroll*, 52,484 (La. App. 2 Cir. 2/27/19), 266 So. 3d 499.

## CONCLUSION

For the foregoing reasons, we affirm defendant's conviction and sentence.

**AFFIRMED.**